538 U.S. 1 (2003)
 BEN CHAVEZ, PETITIONER
v.
OLIVERIO MARTINEZ
 No. 01-1444.
 Supreme Court of United States.
 Argued December 4, 2002.
 Decided May 27, 2003.
 
 While respondent Martinez was being treated for gunshot wounds received during an altercation with police, he was interrogated by petitioner Chavez, a patrol supervisor. Martinez admitted that he used heroin and had taken an officer's gun during the incident. At no point was Martinez given Miranda warnings. Although he was never charged with a crime, and his answers were never used against him in any criminal proceeding, Martinez filed a 42 U. S. C. § 1983 suit, maintaining, among other things, that Chavez's actions violated his Fifth Amendment right not to be "compelled in any criminal case to be a witness against himself," and his Fourteenth Amendment substantive due process right to be free from coercive questioning. The District Court ruled that Chavez was not entitled to qualified immunity, and the Ninth Circuit affirmed, finding that Chavez's coercive questioning violated Martinez's Fifth Amendment rights even though his statements were not used against him in a criminal proceeding, and that a police officer violates due process when he obtains a confession by coercive conduct, regardless of whether the confession is subsequently used at trial.
 Held: The judgment is reversed, and the case is remanded.
 270 F. 3d 852, reversed and remanded.
 JUSTICE THOMAS, joined by THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE SCALIA, concluded in Part II-A that Chavez did not deprive Martinez of his Fifth Amendment rights. Pp. 4-12.
 
 
 1
 (a) An officer is entitled to qualified immunity if his alleged conduct did not violate a constitutional right. See Saucier v. Katz, 533 U. S. 194, 201. The text of the Fifth Amendment's Self-Incrimination Clause cannot support the Ninth Circuit's view that mere compulsive questioning violates the Constitution. A "criminal case" at the very least requires the initiation of legal proceedings, and police questioning does not constitute such a case. Statements compelled by police interrogation may not be used against a defendant in a criminal case, but it is not until such use that the Self-Incrimination Clause is violated, see United States v. Verdugo-Urquidez, 494 U. S. 259, 264. Martinez was never made to be a "witness" against himself because his statements were never admitted as testimony against him in a criminal case. Nor was he ever placed under oath and exposed to "`the cruel trilemma of self-accusation, perjury or contempt.'" Michigan v. Tucker, 417 U. S. 433, 445. Pp. 4-5.
 
 
 2
 (b) The Ninth Circuit's approach is also irreconcilable with this Court's case law. The government may compel witnesses to testify at trial or before a grand jury, on pain of contempt, so long as the witness is not the target of the criminal case in which he testifies, see, e.g., Kastigar v. United States, 406 U. S. 441, 443; and this Court has long permitted the compulsion of incriminating testimony so long as the statements (or evidence derived from them) cannot be used against the speaker in a criminal case, id., at 458. Martinez was no more compelled in a criminal case to be a witness against himself than an immunized witness forced to testify on pain of contempt. That an immunized witness knows that his statements may not be used against him, while Martinez likely did not, does not make the immunized witness' statements any less compelled and lends no support to the Ninth Circuit's conclusion that coercive police interrogations alone violate the Fifth Amendment. Moreover, those subjected to coercive interrogations have an automatic protection from the use of their involuntary statements in any subsequent criminal trial, e.g., Oregon v. Elstad, 470 U. S. 298, 307-308, which is coextensive with the use and derivative use immunity mandated by Kastigar. Pp. 6-8.
 
 
 3
 (c) The fact that the Court has permitted the Fifth Amendment privilege to be asserted in noncriminal cases does not alter the conclusion in this case. Judicially created prophylactic rules—such as the rule allowing a witness to insist on an immunity agreement before being compelled to give testimony in noncriminal cases, and the exclusionary rule—are designed to safeguard the core constitutional right protected by the Self-Incrimination Clause. They do not extend the scope of that right itself, just as violations of such rules do not violate a person's constitutional rights. Accordingly, Chavez's failure to read Miranda warnings to Martinez did not violate Martinez's constitutional rights and cannot be grounds for a § 1983 action. And the absence of a "criminal case" in which Martinez was compelled to be a "witness" against himself defeats his core Fifth Amendment claim. Pp. 8-12.
 
 
 4
 JUSTICE SOUTER delivered the opinion of the Court with respect to Part II, concluding that the issue whether Martinez may pursue a claim of liability for a substantive due process violation should be addressed on remand. P. 4.
 
 
 5
 JUSTICE SOUTER, joined by JUSTICE BREYER, concluded in Part I that Martinez's claim that his questioning alone was a violation of the Fifth and Fourteenth Amendments subject to redress by a 42 U. S. C. § 1983 damages action, though outside the core of Fifth Amendment protection, could be recognized if a core guarantee, or the judicial capacity to protect it, would be placed at risk absent complementary protection, see, e.g., McCarthy v. Arndstein, 266 U. S. 34, 40. However, Martinez cannot make the "powerful showing" necessary to expand protection of the privilege against self-incrimination to the point of the civil liability he requests. Inherent in his purely Fifth Amendment claim is the risk of global application in every instance of interrogation producing a statement inadmissible under the Fifth and Fourteenth Amendments, or violating one of the complementary rules this Court has accepted in aid of the core privilege. And Martinez has offered no reason to believe that this new rule is necessary in aid of the basic guarantee. Pp. 1-4.
 
 
 6
 ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 
 
 7
 THOMAS, J., announced the judgment of the Court and delivered an opinion, which was joined by REHNQUIST, C. J., in full, by O'CONNOR, J., as to Parts I and II-A, and by SCALIA, J., as to Parts I and II. SOUTER, J., delivered an opinion, Part II of which was for the Court and was joined by STEVENS, KENNEDY, GINSBURG, and BREYER, JJ., and Part I of which concurred in the judgment and was joined by BREYER, J. SCALIA, J., filed an opinion concurring in part in the judgment. STEVENS, J., filed an opinion concurring in part and dissenting in part. KENNEDY, J., filed an opinion concurring in part and dissenting in part, which was joined by STEVENS, J., in full and by GINSBURG, J., as to Parts II and III. GINSBURG, J., filed an opinion concurring in part and dissenting in part.
 
 
 8
 JUSTICE THOMAS announced the judgment of the Court and delivered an opinion.*
 
 
 9
 This case involves a § 1983 suit arising out of petitioner Ben Chavez's allegedly coercive interrogation of respondent Oliverio Martinez. The United States Court of Appeals for the Ninth Circuit held that Chavez was not entitled to a defense of qualified immunity because he violated Martinez's clearly established constitutional rights. We conclude that Chavez did not deprive Martinez of a constitutional right.
 
 
 10
 * On November 28, 1997, police officers Maria Peña and Andrew Salinas were near a vacant lot in a residential area of Oxnard, California, investigating suspected narcotics activity. While Peña and Salinas were questioning an individual, they heard a bicycle approaching on a darkened path that crossed the lot. They ordered the rider, respondent Martinez, to dismount, spread his legs, and place his hands behind his head. Martinez complied. Salinas then conducted a patdown frisk and discovered a knife in Martinez's waistband. An altercation ensued.[1]
 
 
 11
 There is some dispute about what occurred during the altercation. The officers claim that Martinez drew Salinas' gun from its holster and pointed it at them; Martinez denies this. Both sides agree, however, that Salinas yelled, " `He's got my gun!' " App. to Pet. for Cert. 3a. Peña then drew her gun and shot Martinez several times, causing severe injuries that left Martinez permanently blinded and paralyzed from the waist down. The officers then placed Martinez under arrest.
 
 
 12
 Petitioner Chavez, a patrol supervisor, arrived on the scene minutes later with paramedics. Chavez accompanied Martinez to the hospital and then questioned Martinez there while he was receiving treatment from medical personnel. The interview lasted a total of about 10 minutes, over a 45-minute period, with Chavez leaving the emergency room for periods of time to permit medical personnel to attend to Martinez.
 
 
 13
 At first, most of Martinez's answers consisted of "I don't know," "I am dying," and "I am choking." App. 14, 17, 18. Later in the interview, Martinez admitted that he took the gun from the officer's holster and pointed it at the police. Id., at 16. He also admitted that he used heroin regularly. Id., at 18. At one point, Martinez said "I am not telling you anything until they treat me," yet Chavez continued the interview. Id., at 14. At no point during the interview was Martinez given Miranda warnings under Miranda v. Arizona, 384 U. S. 436 (1966). App. 4.
 
 
 14
 Martinez was never charged with a crime, and his answers were never used against him in any criminal prosecution. Nevertheless, Martinez filed suit under Rev. Stat. § 1979, 42 U. S. C. § 1983, maintaining that Chavez's actions violated his Fifth Amendment right not to be "compelled in any criminal case to be a witness against himself," as well as his Fourteenth Amendment substantive due process right to be free from coercive questioning. The District Court granted summary judgment to Martinez as to Chavez's qualified immunity defense on both the Fifth and Fourteenth Amendment claims. Chavez took an interlocutory appeal to the Ninth Circuit, which affirmed the District Court's denial of qualified immunity. Martinez v. Oxnard, 270 F. 3d 852 (2001). Applying Saucier v. Katz, 533 U. S. 194 (2001), the Ninth Circuit first concluded that Chavez's actions, as alleged by Martinez, deprived Martinez of his rights under the Fifth and Fourteenth Amendments. The Ninth Circuit did not attempt to explain how Martinez had been "compelled in any criminal case to be a witness against himself." Instead, the Ninth Circuit reiterated the holding of an earlier Ninth Circuit case, Cooper v. Dupnik, 963 F. 2d 1220, 1229 (1992) (en banc), that "the Fifth Amendment's purpose is to prevent coercive interrogation practices that are destructive of human dignity," 270 F. 3d, at 857 (internal quotation marks omitted), and found that Chavez's "coercive questioning" of Martinez violated his Fifth Amendment rights, "[e]ven though Martinez's statements were not used against him in a criminal proceeding," ibid. As to Martinez's due process claim, the Ninth Circuit held that "a police officer violates the Fourteenth Amendment when he obtains a confession by coercive conduct, regardless of whether the confession is subsequently used at trial." Ibid.
 
 
 15
 The Ninth Circuit then concluded that the Fifth and Fourteenth Amendment rights asserted by Martinez were clearly established by federal law, explaining that a reasonable officer "would have known that persistent interrogation of the suspect despite repeated requests to stop violated the suspect's Fifth and Fourteenth Amendment right to be free from coercive interrogation." Id., at 858.
 
 
 16
 We granted certiorari. 535 U. S. 1111 (2002).
 
 II
 
 17
 In deciding whether an officer is entitled to qualified immunity, we must first determine whether the officer's alleged conduct violated a constitutional right. See Katz, 533 U. S., at 201. If not, the officer is entitled to qualified immunity, and we need not consider whether the asserted right was "clearly established." Ibid. We conclude that Martinez's allegations fail to state a violation of his constitutional rights.
 
 
 18
 * 1
 
 
 19
 The Fifth Amendment, made applicable to the States by the Fourteenth Amendment, Malloy v. Hogan, 378 U. S. 1 (1964), requires that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U. S. Const., Amdt. 5 (emphases added). We fail to see how, based on the text of the Fifth Amendment, Martinez can allege a violation of this right, since Martinez was never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case.
 
 
 20
 Although Martinez contends that the meaning of "criminal case" should encompass the entire criminal investigatory process, including police interrogations, Brief for Respondent 23, we disagree. In our view, a "criminal case" at the very least requires the initiation of legal proceedings. See Blyew v. United States, 13 Wall. 581, 595 (1872) ("The words `case' and `cause' are constantly used as synonyms in statutes and judicial decisions, each meaning a proceeding in court, a suit, or action" (emphasis added)); Black's Law Dictionary 215 (6th ed. 1990) (defining "[c]ase" as "[a] general term for an action, cause, suit, or controversy at law . . . a question contested before a court of justice" (emphasis added)). We need not decide today the precise moment when a "criminal case" commences; it is enough to say that police questioning does not constitute a "case" any more than a private investigator's precomplaint activities constitute a "civil case." Statements compelled by police interrogations of course may not be used against a defendant at trial, see Brown v. Mississippi, 297 U. S. 278, 286 (1936), but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs, see United States v. Verdugo-Urquidez, 494 U. S. 259, 264 (1990) ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial" (emphases added; citations omitted)); Withrow v. Williams, 507 U. S. 680, 692 (1993) (describing the Fifth Amendment as a " `trial right'"); id., at 705 (O'CONNOR, J., concurring in part and dissenting in part) (describing "true Fifth Amendment claims" as "the extraction and use of compelled testimony" (emphasis altered)).
 
 
 21
 Here, Martinez was never made to be a "witness" against himself in violation of the Fifth Amendment's Self-Incrimination Clause because his statements were never admitted as testimony against him in a criminal case. Nor was he ever placed under oath and exposed to "`the cruel trilemma of self-accusation, perjury or contempt.'" Michigan v. Tucker, 417 U. S. 433, 445 (1974) (quoting Murphy v. Waterfront Comm'n of N. Y. Harbor, 378 U. S. 52, 55 (1964)). The text of the Self-Incrimination Clause simply cannot support the Ninth Circuit's view that the mere use of compulsive questioning, without more, violates the Constitution.
 
 2
 
 22
 Nor can the Ninth Circuit's approach be reconciled with our case law. It is well established that the government may compel witnesses to testify at trial or before a grand jury, on pain of contempt, so long as the witness is not the target of the criminal case in which he testifies. See Minnesota v. Murphy, 465 U. S. 420, 427 (1984); Kastigar v. United States, 406 U. S. 441, 443 (1972). Even for persons who have a legitimate fear that their statements may subject them to criminal prosecution, we have long permitted the compulsion of incriminating testimony so long as those statements (or evidence derived from those statements) cannot be used against the speaker in any criminal case. See Brown v. Walker, 161 U. S. 591, 602-604 (1896); Kastigar, supra, at 458; United States v. Balsys, 524 U. S. 666, 671-672 (1998). We have also recognized that governments may penalize public employees and government contractors (with the loss of their jobs or government contracts) to induce them to respond to inquiries, so long as the answers elicited (and their fruits) are immunized from use in any criminal case against the speaker. See Lefkowitz v. Turley, 414 U. S. 70, 84-85 (1973) ("[T]he State may insist that [contractors] . . . either respond to relevant inquiries about the performance of their contracts or suffer cancellation"); Lefkowitz v. Cunningham, 431 U. S. 801, 806 (1977) ("Public employees may constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to surrender their constitutional immunity" against later use of statements in criminal proceedings).[2] By contrast, no "penalty" may ever be imposed on someone who exercises his core Fifth Amendment right not to be a "witness" against himself in a "criminal case." See Griffin v. California, 380 U. S. 609, 614 (1965) (the trial court's and the prosecutor's comments on the defendant's failure to testify violates the Self-Incrimination Clause of the Fifth Amendment). Our holdings in these cases demonstrate that, contrary to the Ninth Circuit's view, mere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled statements in a criminal case against the witness.
 
 
 23
 We fail to see how Martinez was any more "compelled in any criminal case to be a witness against himself" than an immunized witness forced to testify on pain of contempt. One difference, perhaps, is that the immunized witness knows that his statements will not, and may not, be used against him, whereas Martinez likely did not. But this does not make the statements of the immunized witness any less "compelled" and lends no support to the Ninth Circuit's conclusion that coercive police interrogations, absent the use of the involuntary statements in a criminal case, violate the Fifth Amendment's Self-Incrimination Clause. Moreover, our cases provide that those subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial. Oregon v. Elstad, 470 U. S. 298, 307-308 (1985); United States v. Blue, 384 U. S. 251, 255 (1966); Leyra v. Denno, 347 U. S. 556, 558 (1954); Ashcraft v. Tennessee, 322 U. S. 143, 155 (1944). See also Pillsbury Co. v. Conboy, 459 U. S. 248, 278 (1983) (Blackmun, J., concurring in judgment); Williams v. United States, 401 U. S. 646, 662 (1971) (Brennan, J., concurring in result). This protection is, in fact, coextensive with the use and derivative use immunity mandated by Kastigar when the government compels testimony from a reluctant witness. See 406 U. S., at 453. Accordingly, the fact that Martinez did not know his statements could not be used against him does not change our view that no violation of Fifth Amendment's Self-Incrimination Clause occurred here.
 
 3
 
 24
 Although our cases have permitted the Fifth Amendment's self-incrimination privilege to be asserted in noncriminal cases, see id., at 444-445 (recognizing that the "Fifth Amendment privilege against compulsory selfincrimination . . . can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory . . ."); Lefkowitz v. Turley, supra, at 77 (stating that the Fifth Amendment privilege allows one "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings"), that does not alter our conclusion that a violation of the constitutional right against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case.
 
 
 25
 In the Fifth Amendment context, we have created prophylactic rules designed to safeguard the core constitutional right protected by the Self-Incrimination Clause. See, e.g., Tucker, 417 U. S., at 444 (describing the "procedural safeguards" required by Miranda as "not themselves rights protected by the Constitution but . . . measures to insure that the right against compulsory selfincrimination was protected" to "provide practical reinforcement for the right"); Elstad, supra, at 306 (stating that "[t]he Miranda exclusionary rule . . . serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself"). Among these rules is an evidentiary privilege that protects witnesses from being forced to give incriminating testimony, even in noncriminal cases, unless that testimony has been immunized from use and derivative use in a future criminal proceeding before it is compelled. See Kastigar, supra, at 453; Maness v. Meyers, 419 U. S. 449, 461-462 (1975) (noting that the Fifth Amendment privilege may be asserted if one is "compelled to produce evidence which later may be used against him as an accused in a criminal action" (emphasis added)).
 
 
 26
 By allowing a witness to insist on an immunity agreement before being compelled to give incriminating testimony in a noncriminal case, the privilege preserves the core Fifth Amendment right from invasion by the use of that compelled testimony in a subsequent criminal case. See Tucker, supra, at 440-441 ("Testimony obtained in civil suits, or before administrative or legislative committees, could [absent a grant of immunity] prove so incriminating that a person compelled to give such testimony might readily be convicted on the basis of those disclosures in a subsequent criminal proceeding"). Because the failure to assert the privilege will often forfeit the right to exclude the evidence in a subsequent "criminal case," see Murphy, 465 U. S., at 440; Garner v. United States, 424 U. S. 648, 650 (1976) (failure to claim privilege against selfincrimination before disclosing incriminating information on tax returns forfeited the right to exclude that information in a criminal prosecution); United States v. Kordel, 397 U. S. 1, 7 (1970) (criminal defendant forfeited his right to assert Fifth Amendment privilege with regard to answers he gave to interrogatories in a prior civil proceeding), it is necessary to allow assertion of the privilege prior to the commencement of a "criminal case" to safeguard the core Fifth Amendment trial right. If the privilege could not be asserted in such situations, testimony given in those judicial proceedings would be deemed "voluntary," see Rogers v. United States, 340 U. S. 367, 371 (1951); United States v. Monia, 317 U. S. 424, 427 (1943); hence, insistence on a prior grant of immunity is essential to memorialize the fact that the testimony had indeed been compelled and therefore protected from use against the speaker in any "criminal case."
 
 
 27
 Rules designed to safeguard a constitutional right, however, do not extend the scope of the constitutional right itself, just as violations of judicially crafted prophylactic rules do not violate the constitutional rights of any person. As we explained, we have allowed the Fifth Amendment privilege to be asserted by witnesses in noncriminal cases in order to safeguard the core constitutional right defined by the Self-Incrimination Clause—the right not to be compelled in any criminal case to be a witness against oneself.[3] We have likewise established the Miranda exclusionary rule as a prophylactic measure to prevent violations of the right protected by the text of the Self-Incrimination Clause—the admission into evidence in criminal case of confessions obtained through coercive custodial questioning. See Warren v. Lincoln, 864 F. 2d 1436, 1442 (CA8 1989) (alleged Miranda violation not actionable under § 1983); Giuffre v. Bissell, 31 F. 3d 1241, 1256 (CA3 1994) (same); Bennett v. Passic, 545 F. 2d 1260, 1263 (CA10 1976) (same); see also New York v. Quarles, 467 U. S. 649, 686 (1984) (Marshall, J., dissenting) ("All the Fifth Amendment forbids is the introduction of coerced statements at trial"). Accordingly, Chavez's failure to read Miranda warnings to Martinez did not violate Martinez's constitutional rights and cannot be grounds for a § 1983 action. See Connecticut v. Barrett, 479 U. S. 523, 528 (1987) (Miranda's warning requirement is "not itself required by the Fifth Amendmen[t] . . . but is instead justified only by reference to its prophylactic purpose"); Tucker, 417 U. S., at 444 (Miranda's safeguards "were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected"). And the absence of a "criminal case" in which Martinez was compelled to be a "witness" against himself defeats his core Fifth Amendment claim. The Ninth Circuit's view that mere compulsion violates the Self-Incrimination Clause, see 270 F. 3d, at 857; California Attorneys for Criminal Justice v. Butts, 195 F. 3d 1039, 1045-1046 (1999); Cooper, 963 F. 2d, at 1243-1244, finds no support in the text of the Fifth Amendment and is irreconcilable with our case law.[4] Because we find that Chavez's alleged conduct did not violate the Self-Incrimination Clause, we reverse the Ninth Circuit's denial of qualified immunity as to Martinez's Fifth Amendment claim.
 
 
 28
 Our views on the proper scope of the Fifth Amendment's Self-Incrimination Clause do not mean that police torture or other abuse that results in a confession is constitutionally permissible so long as the statements are not used at trial; it simply means that the Fourteenth Amendment's Due Process Clause, rather than the Fifth Amendment's Self-Incrimination Clause, would govern the inquiry in those cases and provide relief in appropriate circumstances.[5]
 
 B
 
 29
 The Fourteenth Amendment provides that no person shall be deprived "of life, liberty, or property, without due process of law." Convictions based on evidence obtained by methods that are "so brutal and so offensive to human dignity" that they "shoc[k] the conscience" violate the Due Process Clause. Rochin v. California, 342 U. S. 165, 172, 174 (1952) (overturning conviction based on evidence obtained by involuntary stomach pumping). See also Breithaupt v. Abram, 352 U. S. 432, 435 (1957) (reiterating that evidence obtained through conduct that " `shock[s] the conscience'" may not be used to support a criminal conviction). Although Rochin did not establish a civil remedy for abusive police behavior, we recognized in County of Sacramento v. Lewis, 523 U. S. 833, 846 (1998), that deprivations of liberty caused by "the most egregious official conduct," id., at 846, 847-848, n. 8, may violate the Due Process Clause. While we rejected, in Lewis, a § 1983 plaintiff's contention that a police officer's deliberate indifference during a high-speed chase that caused the death of a motorcyclist violated due process, id., at 854, we left open the possibility that unauthorized police behavior in other contexts might "shock the conscience" and give rise to § 1983 liability. Id., at 850.
 
 
 30
 We are satisfied that Chavez's questioning did not violate Martinez's due process rights. Even assuming, arguendo, that the persistent questioning of Martinez somehow deprived him of a liberty interest, we cannot agree with Martinez's characterization of Chavez's behavior as "egregious" or "conscience shocking." As we noted in Lewis, the official conduct "most likely to rise to the conscience-shocking level," is the "conduct intended to injure in some way unjustifiable by any government interest." Id., at 849. Here, there is no evidence that Chavez acted with a purpose to harm Martinez by intentionally interfering with his medical treatment. Medical personnel were able to treat Martinez throughout the interview, App. to Pet. for Cert. 4a, 18a, and Chavez ceased his questioning to allow tests and other procedures to be performed. Id., at 4a. Nor is there evidence that Chavez's conduct exacerbated Martinez's injuries or prolonged his stay in the hospital. Moreover, the need to investigate whether there had been police misconduct constituted a justifiable government interest given the risk that key evidence would have been lost if Martinez had died without the authorities ever hearing his side of the story.
 
 
 31
 The Court has held that the Due Process Clause also protects certain "fundamental liberty interest[s]" from deprivation by the government, regardless of the procedures provided, unless the infringement is narrowly tailored to serve a compelling state interest. Washington v. Glucksberg, 521 U. S. 702, 721 (1997). Only fundamental rights and liberties which are "`deeply rooted in this Nation's history and tradition' " and " `implicit in the concept of ordered liberty'" qualify for such protection. Ibid. Many times, however, we have expressed our reluctance to expand the doctrine of substantive due process, see Lewis, supra, at 842; Glucksberg, supra, at 720; Albright v. Oliver, 510 U. S. 266, 271 (1994); Reno v. Flores, 507 U. S. 292, 302 (1993); in large part "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," Collins v. Harker Heights, 503 U. S. 115, 125 (1992). See also Regents of Univ. of Mich. v. Ewing, 474 U. S. 214, 225-226 (1985).
 
 
 32
 Glucksberg requires a "`careful description'" of the asserted fundamental liberty interest for the purposes of substantive due process analysis; vague generalities, such as "the right not to be talked to," will not suffice. 521 U. S., at 721. We therefore must take into account the fact that Martinez was hospitalized and in severe pain during the interview, but also that Martinez was a critical nonpolice witness to an altercation resulting in a shooting by a police officer, and that the situation was urgent given the perceived risk that Martinez might die and crucial evidence might be lost. In these circumstances, we can find no basis in our prior jurisprudence, see, e.g., Miranda, 384 U. S., at 477-478 ("It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement"), or in our Nation's history and traditions to suppose that freedom from unwanted police questioning is a right so fundamental that it cannot be abridged absent a "compelling state interest." Flores, supra, at 302. We have never required such a justification for a police interrogation, and we decline to do so here. The lack of any "guideposts for responsible decisionmaking" in this area, and our oft-stated reluctance to expand the doctrine of substantive due process, further counsel against recognizing a new "fundamental liberty interest" in this case.
 
 
 33
 We conclude that Martinez has failed to allege a violation of the Fourteenth Amendment, and it is therefore unnecessary to inquire whether the right asserted by Martinez was clearly established.
 
 III
 
 34
 Because Chavez did not violate Martinez's Fifth and Fourteenth Amendment rights, he was entitled to qualified immunity. The judgment of the Court of Appeals for the Ninth Circuit is therefore reversed and the case is remanded for further proceedings.
 
 
 35
 
 It is so ordered.
 
 
 
 
 Notes:
 
 
 *
 THE CHIEF JUSTICE joins this opinion in its entirety. JUSTICE O'CONNOR joins Parts I and II-A of this opinion. JUSTICE SCALIA joins Parts I and II of this opinion
 
 
 [1]
 The parties disagree over what triggered the altercation. The officers maintain that Martinez ran away from them and that they tackled him while in pursuit; Martinez asserts that he never attempted to flee and Salinas tackled him without warning
 
 
 [2]
 The government may not, however, penalize public employees and government contractors to induce them to waive theirimmunity from the use of their compelled statements in subsequent criminal proceedings. See Uniformed Sanitation Men Assn., Inc. v. Commissioner of Sanitation of City of New York, 392 U. S. 280 (1968); Lefkowitz v. Turley, 414 U. S. 70 (1973), and this is true even though immunity is not itself a right secured by the text of the Self-Incrimination Clause, but rather a prophylactic rule we have constructed to protect the Fifth Amendment's right from invasion. See Part II-A-3, infra. Once an immunity waiver is signed, the signatory is unable to assert a Fifth Amendment objection to the subsequent use of his statements in a criminal case, even if his statements were in fact compelled. A waiver of immunity is therefore a prospective waiver of the core selfincrimination right in any subsequent criminal proceeding, and States cannot condition public employment on the waiver of constitutional rights, Lefkowitz, supra, at 85.
 
 
 [3]
 That the privilege is a prophylactic one does not alter our penalty cases jurisprudence, which allows such privilege to be asserted prior to, and outside of, criminal proceedings
 
 
 [4]
 It is JUSTICE KENNEDY's indifference to the text of the Self-Incrimination Clause, as well as a conspicuous absence of a single citation to the actual text of the Fifth Amendment, that permits him to adopt the Ninth Circuit's interpretation
 Mincey v. Arizona, 437 U. S. 385 (1978), on which JUSTICE KENNEDY and JUSTICE GINSBURG rely in support of their reading of the Fifth Amendment, was a case addressing the admissibility of a coerced confession under the Due Process Clause. Mincey did not even mention the Fifth Amendment or the Self-Incrimination Clause, and refutes JUSTICE KENNEDY's and JUSTICE GINSBURG's assertions that their interpretation of that Clause would have been known to any reasonable officer at the time Chavez conducted his interrogation.
 
 
 [5]
 We also do not see how, in light ofGraham v. Connor, 490 U. S. 386 (1989), JUSTICE KENNEDY can insist that "the Self-Incrimination Clause is applicable at the time and place police use compulsion to extract a statement from a suspect" while at the same time maintaining that the use of "torture or its equivalent in an attempt to induce a statement" violates the Due Process Clause. Post, at 8. Graham foreclosed the use of substantive due process analysis in claims involving the use of excessive force in effecting an arrest and held that such claims are governed solely by the Fourth Amendment's prohibitions against "unreasonable" seizures, because the Fourth Amendment provided the explicit source of constitutional protection against such conduct. 490 U. S., at 394-395. If, as JUSTICE KENNEDY believes, the Fifth Amendment's Self-Incrimination Clause governs coercive police interrogation even absent use of compelled statements in a criminal case, then Graham suggests that the Due Process Clause would not.
 
 
 
 36
 JUSTICE SOUTER, delivered an opinion, Part II of which is the opinion of the Court, and Part I of which is an opinion concurring in the judgment.*
 
 
 37
 * Respondent Martinez's claim under 42 U. S. C. § 1983 for violation of his privilege against compelled selfincrimination should be rejected and his case remanded for further proceedings. I write separately because I believe that our decision requires a degree of discretionary judgment greater than JUSTICE THOMAS acknowledges. As he points out, the text of the Fifth Amendment (applied here under the doctrine of Fourteenth Amendment incorporation) focuses on courtroom use of a criminal defendant's compelled, self-incriminating testimony, and the core of the guarantee against compelled self-incrimination is the exclusion of any such evidence. JUSTICE GINSBURG makes it clear that the present case is very close to Mincey v. Arizona, 437 U. S. 385 (1978), and Martinez's testimony would clearly be inadmissible if offered in evidence against him. But Martinez claims more than evidentiary protection in asking this Court to hold that the questioning alone was a completed violation of the Fifth and Fourteenth Amendments subject to redress by an action for damages under § 1983.
 
 
 38
 To recognize such a constitutional cause of action for compensation would, of course, be well outside the core of Fifth Amendment protection, but that alone is not a sufficient reason to reject Martinez's claim. As Justice Harlan explained in his dissent in Miranda v. Arizona, 384 U. S. 436 (1966), "extension[s]" of the bare guarantee may be warranted, id., at 510, if clearly shown to be desirable means to protect the basic right against the invasive pressures of contemporary society, id., at 515. In this light, we can make sense of a variety of Fifth Amendment holdings: barring compulsion to give testimonial evidence in a civil proceeding, see McCarthy v. Arndstein, 266 U. S. 34, 40 (1924); requiring a grant of immunity in advance of any testimonial proffer, see Kastigar v. United States, 406 U. S. 441, 446-447 (1972); precluding threats or impositions of penalties that would undermine the right to immunity, see, e. g., Uniformed Sanitation Men Assn., Inc. v. Commissioner of Sanitation of City of New York, 392 U. S. 280, 284-285 (1968); Lefkowitz v. Turley, 414 U. S. 70, 77-79 (1973); Lefkowitz v. Cunningham, 431 U. S. 801, 804-806 (1977); McKune v. Lile, 536 U. S. 24, 35 (2002) (plurality opinion); and conditioning admissibility on warnings and waivers to promote intelligent choices and to simplify subsequent inquiry into voluntariness, see Miranda, supra. All of this law is outside the Fifth Amendment's core, with each case expressing a judgment that the core guarantee, or the judicial capacity to protect it, would be placed at some risk in the absence of such complementary protection.
 
 
 39
 I do not, however, believe that Martinez can make the "powerful showing," subject to a realistic assessment of costs and risks, necessary to expand protection of the privilege against compelled self-incrimination to the point of the civil liability he asks us to recognize here. See id., at 515, 517 (Harlan, J., dissenting). The most obvious drawback inherent in Martinez's purely Fifth Amendment claim to damages is its risk of global application in every instance of interrogation producing a statement inadmissible under Fifth and Fourteenth Amendment principles, or violating one of the complementary rules we have accepted in aid of the privilege against evidentiary use. If obtaining Martinez's statement is to be treated as a standalone violation of the privilege subject to compensation, why should the same not be true whenever the police obtain any involuntary self-incriminating statement, or whenever the government so much as threatens a penalty in derogation of the right to immunity, or whenever the police fail to honor Miranda?â€  Martinez offers no limiting principle or reason to foresee a stopping place short of liability in all such cases.
 
 
 40
 Recognizing an action for damages in every such instance not only would revolutionize Fifth and Fourteenth Amendment law, but would beg the question that must inform every extension or recognition of a complementary rule in service of the core privilege: why is this new rule necessary in aid of the basic guarantee? Martinez has offered no reason to believe that the guarantee has been ineffective in all or many of those circumstances in which its vindication has depended on excluding testimonial admissions or barring penalties. And I have no reason to believe the law has been systemically defective in this respect.
 
 
 41
 But if there is no failure of efficacy infecting the existing body of Fifth Amendment law, any argument for a damages remedy in this case must depend not on its Fifth Amendment feature but upon the particular charge of outrageous conduct by the police, extending from their initial encounter with Martinez through the questioning by Chavez. That claim, however, if it is to be recognized as a constitutional one that may be raised in an action under § 1983, must sound in substantive due process. See generally County of Sacramento v. Lewis, 523 U. S. 833, 849 (1998) ("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level"). Here, it is enough to say that JUSTICE STEVENS shows that Martinez has a serious argument in support of such a position.
 
 II
 
 42
 Whether Martinez may pursue a claim of liability for a substantive due process violation is thus an issue that should be addressed on remand, along with the scope and merits of any such action that may be found open to him.
 
 
 
 Notes:
 
 
 *
 JUSTICE BREYER joins this opinion in its entirety. JUSTICE STEVENS, JUSTICE KENNEDY, and JUSTICE GINSBURG join Part II of this opinion
 â€  The question whether the absence of Miranda warnings may be a basis for a § 1983 action under any circumstance is not before the Court.
 
 
 
 43
 JUSTICE SCALIA, concurring in part in the judgment.
 
 
 44
 I agree with the Court's rejection of Martinez's Fifth Amendment claim, that is, his claim that Chavez violated his right not to be compelled in any criminal case to be a witness against himself.[1] See ante, at 4-5 (plurality opinion); ante, at 1-2 (SOUTER, J., concurring in judgment). And without a violation of the right protected by the text of the Self-Incrimination Clause, (what the plurality and JUSTICE SOUTER call the Fifth Amendment's "core"), Martinez's 42 U. S. C. § 1983 action is doomed. Section 1983 does not provide remedies for violations of judicially created prophylactic rules, such as the rule of Miranda v. Arizona, 384 U. S. 436 (1966), as the Court today holds, see ante, at 10-11 (plurality opinion); post, at 1-2 (KENNEDY, J., concurring in part and dissenting in part); nor is it concerned with "extensions" of constitutional provisions designed to safeguard actual constitutional rights, cf. ante, at 1-2 (SOUTER, J., concurring in judgment).[2] Rather, a plaintiff seeking redress through § 1983 must establish the violation of a federal constitutional or statutory right. See Blessing v. Freestone, 520 U. S. 329, 340 (1997); Golden State Transit Corp. v. Los Angeles, 493 U. S. 103, 106 (1989).
 
 
 45
 My reasons for rejecting Martinez's Fifth Amendment claim are those set forth in JUSTICE THOMAS's opinion. I join Parts I and II of that opinion, including Part II-B, which deals with substantive due process. Consideration and rejection of that constitutional claim is absolutely necessary to support reversal of the Ninth Circuit's judgment. For after discussing (and erroneously deciding) Martinez's Fifth Amendment claim, the Ninth Circuit continued as follows:
 
 
 46
 "Likewise, a police officer violates the Fourteenth Amendment when he obtains a confession by coercive conduct, regardless of whether the confession is subsequently used at trial. `The due process violation caused by coercive behavior of law-enforcement officers in pursuit of a confession is complete with the coercive behavior itself.... The actual use or attempted use of that coerced statement in a court of law is not necessary to complete the affront to the Constitution.' Cooper v. Dupnik, 963 F. 2d at 1244-45 (emphasis added). Mr. Martinez has thus stated a prima facie case that Sergeant Chavez violated his Fifth and Fourteenth Amendment rights to be free from police coercion in pursuit of a confession." 270 F. 3d 852, 857 (2001).
 
 
 47
 It seems to me impossible to interpret this passage as anything other than an invocation of the doctrine of "substantive due process," which makes unlawful certain government conduct, regardless of whether the procedural guarantees of the Fifth Amendment (or the guarantees of any of the other provisions of the Bill of Rights) have been violated. See Washington v. Glucksberg, 521 U. S. 702 (1997). To be sure, the term "substantive due process" is not used in the quoted passage, but the passage's technically false dichotomy between Fifth Amendment and Fourteenth Amendment rights uses "Fourteenth Amendment rights" as a stand-in for that aspect of the Fourteenth Amendment which consists of the doctrine of substantive due process. (JUSTICE THOMAS uses similar shorthand in the concluding sentence of his analysis: "[O]ur views on the proper scope of the Fifth Amendment's Self-Incrimination Clause, do not mean that police torture or other abuse that results in a confession is constitutionally permissible so long as the statements are not used at trial; it simply means that the Fourteenth Amendment's Due Process Clause, rather than the Fifth Amendment's Self-Incrimination Clause, would govern the inquiry in those cases." Ante, at 12.) What other possible meaning could the passage possess? Surely the Ninth Circuit was not expending a paragraph to make the utterly useless observation that, in addition to violating the Fifth Amendment (because that is incorporated in the Fourteenth) Chavez violated the Fourteenth Amendment (because that incorporates the Fifth). That substantive due process was the point is confirmed by the fact that the sole authority cited to support violation of "the Fourteenth Amendment" is Cooper v. Dupnik, 963 F. 2d 1220, 1244-245 (1992), a Ninth Circuit case that explicitly recognized a substantive-due-process right to be free from coercive police questioning. See id., at 1244-1250.
 
 
 48
 Since the Ninth Circuit's Fourteenth Amendment holding rested upon substantive due process, we are without authority to disturb that court's judgment solely because of our disagreement with its Fifth Amendment (Self-Incrimination Clause) analysis; the substantive-dueprocess holding provides an independent ground supporting the decision that Chavez was not entitled to qualified immunity. While JUSTICE SOUTER declines to address that independent ground—even though the parties extensively briefed the issue, Brief for Petitioner 21-36; Brief for Respondent 29-40; Reply Brief for Petitioner 8-12; Brief for United States as Amicus Curiae 17-23, and even though JUSTICE STEVENS discusses it in dissent, post, at 4-6 (opinion concurring in part and dissenting in part)—I believe that addressing it, and resolving it against respondent, is essential to the Court's disposition, which reverses the Ninth Circuit's judgment in its entirety.
 
 
 49
 I therefore see no basis for a remand to determine "[w]hether Martinez may pursue a claim of liability for a substantive due process violation." Ante, at 4 (majority opinion). That question has already been decided by the Ninth Circuit, and we today reverse its decision. My disagreement with the Court, however, is of little consequence, because Martinez will not be able to prevail on remand by raising anew his substantive-due-process claim. Not only is the claim meritless, as JUSTICE THOMAS demonstrates, ante, at 12-15, but Martinez already had his chance to press a substantive-due-process theory in the Court of Appeals and chose not to, even though Ninth Circuit precedent clearly established substantive due process (including—contrary to the Government's assertion at oral argument, see Tr. of Oral Arg. 26—a "shocks the conscience" criterion) as an available theory of liability under the Fourteenth Amendment. See Cooper, supra, at 1248. ("There is a second Fourteenth Amendment substantive due process yardstick available to Cooper as a theory of § 1983 liability. The test is whether the Task Force's conduct `shocks the conscience'"). Nowhere did respondent's appellate brief mention the words "substantive due process"; the only rights it asserted were the right against self-incrimination and the right to warnings under Miranda v. Arizona, 384 U. S. 436 (1966). Appellees' Responding Brief in No. 00-56520 (CA9), pp. 28-32, 36-43. If, as JUSTICE SOUTER apparently believes, the opinion below did not address respondent's "substantive due process" claim, that claim has been forfeited.
 
 
 
 Notes:
 
 
 [1]
 While occasionally referring to this as a "Fifth Amendment claim," a convention commonly followed, JUSTICE THOMAS and JUSTICE SOUTER acknowledge that technically it is a Fourteenth Amendment claim, since it is onlythrough the Fourteenth Amendment that the Fifth is "made applicable to the States," ante, at 4 (opinion of THOMAS, J.), citing Malloy v. Hogan, 378 U. S. 1 (1964).
 
 
 [2]
 Still less does § 1983 provide a remedy for actions inconsistent with the perceived "purpose" of a constitutional provision. CfMartinez v. Oxnard, 270 F. 3d 852, 857 (CA9 2001) ("[T]he Fifth Amendment's purpose is to prevent coercive interrogation practices that are destructive of human dignity" (internal quotations marks omitted)).
 
 
 
 50
 JUSTICE STEVENS, concurring in part and dissenting in part.
 
 
 51
 As a matter of fact, the interrogation of respondent was the functional equivalent of an attempt to obtain an involuntary confession from a prisoner by torturous methods. As a matter of law, that type of brutal police conduct constitutes an immediate deprivation of the prisoner's constitutionally protected interest in liberty. Because these propositions are so clear, the District Court and the Court of Appeals correctly held that petitioner is not entitled to qualified immunity.
 
 
 52
 * What follows is an English translation of portions of the tape-recorded questioning in Spanish that occurred in the emergency room of the hospital when, as is evident from the text, both parties believed that respondent was about to die:
 
 
 53
 "Chavez: What happened? Olivero, tell me what happened.
 
 
 54
 "O[liverio] M[artinez]: I don't know
 
 
 55
 "Chavez: I don't know what happened (sic)?
 
 
 56
 "O. M.: Ay! I am dying.
 
 
 57
 Ay! What are you doing to me?
 
 
 58
 No, . . . ! (unintelligible scream).
 
 
 59
 "Chavez: What happened, sir? "O. M.: My foot hurts. . .
 
 
 60
 "Chavez: Olivera. Sir, what happened?
 
 
 61
 "O. M.: I am choking.
 
 
 62
 "Chavez: Tell me what happened.
 
 
 63
 "O. M.: I don't know.
 
 
 64
 "Chavez: `I don't know.'
 
 
 65
 "O. M.: My leg hurts.
 
 
 66
 "Chavez: I don't know what happened (sic)?
 
 
 67
 "O. M.: It hurts. . .
 
 
 68
 "Chavez: Hey, hey look.
 
 
 69
 "O. M.: I am choking.
 
 
 70
 "Chavez: Can you hear? look listen, I am Benjamin Chavez with the police here in Oxnard, look.
 
 
 71
 "O. M.: I am dying, please.
 
 
 72
 "Chavez: OK, yes, tell me what happened. If you are going to die, tell me what happened. Look I need to tell (sic) what happened.
 
 
 73
 "O. M.: I don't know.
 
 
 74
 "Chavez: You don't know, I don't know what happened (sic)? Did you talk to the police?
 
 
 75
 "O. M.: Yes.
 
 
 76
 "Chavez: What happened with the police?
 
 
 77
 "O. M.: We fought.
 
 
 78
 "Chavez: Huh? What happened with the police?
 
 
 79
 "O. M.: The police shot me.
 
 
 80
 "Chavez: Why?
 
 
 81
 "O. M.: Because I was fighting with him.
 
 
 82
 "Chavez: Oh, why were you fighting with the police?
 
 
 83
 "O. M.: I am dying. . .
 
 
 84
 "Chavez: OK, yes you are dying, but tell me why you are fighting, were you fighting with the police?
 
 
 85
 . . . . .
 
 
 86
 "O. M.: Doctor, please I want air, I am dying.
 
 
 87
 "Chavez: OK, OK. I want to know if you pointed the gun [to yourself] at the police.
 
 
 88
 "O. M.: Yes.
 
 
 89
 "Chavez: Yes, and you pointed it [to yourself]? (sic) at the police pointed the gun? (sic) Huh?
 
 
 90
 "O. M.: I am dying, please. . .
 
 
 91
 . . . . .
 
 
 92
 "Chavez: OK, listen, listen I want to know what happened, ok??
 
 
 93
 "O. M.: I want them to treat me.
 
 
 94
 "Chavez: OK, they are do it (sic), look when you took out the gun from the tape (sic) of the police. . .
 
 
 95
 "O. M.: I am dying. . .
 
 
 96
 "Chavez: Ok, look, what I want to know if you took out (sic) the gun of the police?
 
 
 97
 "O. M.: I am not telling you anything until they treat me.
 
 
 98
 "Chavez: Look, tell me what happened, I want to know, look well don't you want the police know (sic) what happened with you?
 
 
 99
 "O. M.: Uuuggghhh! my belly hurts. . .
 
 
 100
 . . . . .
 
 
 101
 "Chavez: Nothing, why did you run (sic) from the police?
 
 
 102
 "O. M.: I don't want to say anything anymore.
 
 
 103
 "Chavez: No?
 
 
 104
 "O. M.: I want them to treat me, it hurts a lot, please.
 
 
 105
 "Chavez: You don't want to tell (sic) what happened with you over there?
 
 
 106
 "O. M.: I don't want to die, I don't want to die.
 
 
 107
 "Chavez: Well if you are going to die tell me what happened, and right now you think you are going to die?
 
 
 108
 "O. M.: No.
 
 
 109
 "Chavez: No, do you think you are going to die?
 
 
 110
 "O. M.: Aren't you going to treat me or what?
 
 
 111
 "Chavez: Look, think you are going to die, (sic) that's all I want to know, if you think you are going to die? Right now, do you think you are going to die? "O. M.: My belly hurts, please treat me.
 
 
 112
 "Chavez: Sir?
 
 
 113
 "O. M.: If you treat me I tell you everything, if not, no.
 
 
 114
 "Chavez: Sir, I want to know if you think you are going to die right now?
 
 
 115
 "O. M.: I think so.
 
 
 116
 "Chavez: You think (sic) so? Ok. Look, the doctors are going to help you with all they can do, Ok?. That they can do.
 
 
 117
 "O. M.: Get moving, I am dying, can't you see me? come on.
 
 
 118
 "Chavez: Ah, huh, right now they are giving you medication." App. 8-22.
 
 
 119
 The sound recording of this interrogation, which has been lodged with the Court, vividly demonstrates that respondent was suffering severe pain and mental anguish throughout petitioner's persistent questioning.
 
 II
 
 120
 The Due Process Clause of the 14th Amendment protects individuals against state action that either " `shocks the conscience,' Rochin v. California, 342 U. S. 165, 172 (1952), or interferes with rights `implicit in the concept of ordered liberty,' Palko v. Connecticut, 302 U. S. 319, 325-326 (1937)." United States v. Salerno, 481 U. S. 739, 746 (1987). In Palko, the majority of the Court refused to hold that every violation of the Fifth Amendment satisfied the second standard. In a host of other cases, however, the Court has held that unusually coercive police interrogation procedures do violate that standard.[1]
 
 
 121
 By its terms, the Fifth Amendment itself has no application to the States. It is, however, one source of the protections against state actions that deprive individuals of rights "implicit in the concept of ordered liberty" that the Fourteenth Amendment guarantees. Indeed, as I pointed out in my dissent in Oregon v. Elstad, 470 U. S. 298, 371 (1985), it is the most specific provision in the Bill of Rights "that protects all citizens from the kind of custodial interrogation that was once employed by the Star Chamber, by `the Germans of the 1930's and early 1940's,' and by some of our own police departments only a few decades ago."[2] Whenever it occurs, as it did here, official interrogation of that character is a classic example of a violation of a constitutional right "implicit in the concept of ordered liberty."[3]
 
 
 122
 I respectfully dissent, but for the reasons articulated by JUSTICE KENNEDY, post, at 11, concur in Part II of JUSTICE SOUTER's opinion.
 
 
 
 Notes:
 
 
 [1]
 JUSTICE O'CONNOR listed many of these cases, as well as cases from state courts, inOregon v. Elstad, 470 U. S. 298, 312, n. 3 (1985): "Darwin v. Connecticut, 391 U. S. 346 (1968) (suspect interrogated for 48 hours incommunicado while officers denied access to counsel); Beecher v. Alabama, 389 U. S. 35, 36 (1967) (officer fired rifle next to suspect's ear and said `If you don't tell the truth I am going to kill you'); Clewis v. Texas, 386 U. S. 707 (1967) (suspect was arrested without probable cause, interrogated for nine days with little food or sleep, and gave three unwarned `confessions' each of which he immediately retracted); Reck v. Pate, 367 U. S 433, 439-440, n. 3 (1961) (mentally retarded youth interrogated incommunicado for a week `during which time he was frequently ill, fainted several times, vomited blood on the floor of the police station and was twice taken to the hospital on a stretcher').... Cagle v. State, 45 Ala. App. 3, 4, 221 So. 2d 119, 120 (1969) (police interrogated wounded suspect at police station for one hour before obtaining statement, took him to hospital to have his severe wounds treated, only then giving the Miranda warnings; suspect prefaced second statement with `I have already give the Chief a statement and I might as well give one to you, too'), cert. denied, 284 Ala. 727, 221 So. 2d 121 (1969); People v. Saiz, 620 P. 2d 15 (Colo. 1980) (two hours' unwarned custodial interrogation of 16-year-old in violation of state law requiring parent's presence, culminating in visit to scene of crime); People v. Bodner, 75 App. Div. 2d 440, 430 N. Y. S. 2d 433 (1980) (confrontation at police station and at scene of crime between police and retarded youth with mental age of eight or nine); State v. Badger, 141 Vt. 430, 441, 450 A. 2d 336, 343 (1982) (unwarned `close and intense' station house questioning of 15-year-old, including threats and promises, resulted in confession at 1:20 a.m.; court held `[w]arnings . . . were insufficient to cure such blatant abuse or compensate for the coercion in this case')."
 
 
 [2]
 Adding to the cases cited by JUSTICE O'CONNOR, I appended this footnote: "See,e.g., Leyra v. Denno, 347 U. S. 556 (1954); Malinski v. New York, 324 U. S. 401 (1945); Ashcraft v. Tennessee, 322 U. S. 143 (1944); Ward v. Texas, 316 U. S. 547 (1942); Vernon v. Alabama, 313 U. S. 547 (1941); White v. Texas, 310 U. S. 530 (1940); Canty v. Alabama, 309 U. S. 629 (1940); Chambers v. Florida, 309 U. S. 227 (1940); Brown v. Mississippi, 297 U. S. 278 (1936); Wakat v. Harlib, 253 F. 2d 59 (CA7 1958); People v. La Frana, 4 Ill. 2d 261, 122 N. E. 2d 583 (1954); cf. People v. Portelli, 15 N. Y. 2d 235, 205 N. E. 2d 857 (1965) (potential witness tortured by police). Such custodial interrogation is, of course, closer to that employed by the Soviet Union than that which our constitutional scheme tolerates. See Coleman v. Alabama, 399 U. S. 1, 15-16 (1970) (opinion of Douglas, J.) (`In [Russia] detention incommunicado is the common practice, and the period of permissible detention now extends for nine months. Where there is custodial interrogation, it is clear that the critical stage of the trial takes place long before the courtroom formalities commence. That is apparent to one who attends criminal trials in Russia. Those that I viewed never put in issue the question of guilt; guilt was an issue resolved in the inner precincts of a prison under questioning by the police')." Id., at 371-372, n. 19 (dissenting opinion).
 
 
 [3]
 A person's constitutional right to remain silent is an interest in liberty that is protected against federal impairment by the Fifth Amendment and from state impairment by the Due Process Clause of the Fourteenth Amendment. JUSTICE THOMAS' opinion is fundamentally flawed in two respects. It incorrectly assumes that the claim it rejects is not a Due Process claim,ante, at 11, and it incorrectly assumes that coercive interrogation is not unconstitutional when it occurs because it merely violates a judge-made "prophylactic" rule. But the violation in this case is far more serious than a mere failure to advise respondent of his Miranda rights; moreover, the Court disavowed the "prophylactic" characterization of Miranda in Dickerson v. United States, 530 U. S. 428, 437-439 (2000).
 
 
 
 123
 JUSTICE KENNEDY, with whom JUSTICE STEVENS joins, and with whom JUSTICE GINSBURG joins as to Parts II and III, concurring in part and dissenting in part.
 
 
 124
 A single police interrogation now presents us with two issues: first, whether failure to give a required warning under Miranda v. Arizona, 384 U. S. 436 (1966), was itself a completed constitutional violation actionable under 42 U. S. C. § 1983; and second, whether an actionable violation arose at once under the Self-Incrimination Clause (applicable to the States through the Fourteenth Amendment) when the police, after failing to warn, used severe compulsion or extraordinary pressure in an attempt to elicit a statement or confession.
 
 
 125
 I agree with JUSTICE THOMAS that failure to give a Miranda warning does not, without more, establish a completed violation when the unwarned interrogation ensues. As to the second aspect of the case, which does not involve the simple failure to give a Miranda warning, it is my respectful submission that JUSTICE SOUTER and JUSTICE THOMAS are incorrect. They conclude that a violation of the Self-Incrimination Clause does not arise until a privileged statement is introduced at some later criminal proceeding.
 
 
 126
 A constitutional right is traduced the moment torture or its close equivalents are brought to bear. Constitutional protection for a tortured suspect is not held in abeyance until some later criminal proceeding takes place. These are the premises of this separate opinion.
 
 
 127
 * The Miranda warning, as is now well settled, is a constitutional requirement adopted to reduce the risk of a coerced confession and to implement the Self-Incrimination Clause. Dickerson v. United States, 530 U. S. 428, 444 (2000); Miranda v. Arizona, supra, at 467. Miranda mandates a rule of exclusion. It must be so characterized, for it has significant exceptions that can only be assessed and determined in the course of trial. Unwarned custodial interrogation does not in every instance violate Miranda. See, e.g., New York v. Quarles, 467 U. S. 649 (1984) (statement admissible if questioning was immediately necessary for public safety). Furthermore, statements secured in violation of Miranda are admissible in some instances. See, e.g., Harris v. New York, 401 U. S. 222 (1971) (statement admissible for purposes of impeachment). The identification of a Miranda violation and its consequences, then, ought to be determined at trial. The exclusion of unwarned statements, when not within an exception, is a complete and sufficient remedy.
 
 II
 
 128
 JUSTICE SOUTER and JUSTICE THOMAS are wrong, in my view, to maintain that in all instances a violation of the Self-Incrimination Clause simply does not occur unless and until a statement is introduced at trial, no matter how severe the pain or how direct and commanding the official compulsion used to extract it.
 
 
 129
 It must be remembered that the Self-Incrimination Clause of the Fifth Amendment is applicable to the States in its full text through the Due Process Clause of the Fourteenth Amendment. Malloy v. Hogan, 378 U. S. 1, 6 (1964); Griffin v. California, 380 U. S. 609, 615 (1965). The question is the proper interpretation of the Self-Incrimination Clause in the context of the present dispute.
 
 
 130
 Our cases and our legal tradition establish that the Self-Incrimination Clause is a substantive constraint on the conduct of the government, not merely an evidentiary rule governing the work of the courts. The Clause must provide more than mere assurance that a compelled statement will not be introduced against its declarant in a criminal trial. Otherwise there will be too little protection against the compulsion the Clause prohibits. The Clause protects an individual from being forced to give answers demanded by an official in any context when the answers might give rise to criminal liability in the future. "It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." Kastigar v. United States, 406 U. S. 441, 444-445 (1972) (footnotes omitted). The decision in Kastigar described the Self-Incrimination Clause as an exemption from the testimonial duty. Ibid. As the duty is immediate, so must be the privilege. Furthermore, the exercise of the privilege depends on what the witness reasonably believes will be the future use of a statement. Id., at 445. Again, this indicates the existence of a present right.
 
 
 131
 The Clause provides both assurance that a person will not be compelled to testify against himself in a criminal proceeding and a continuing right against government conduct intended to bring about self-incrimination. Lefkowitz v. Turley, 414 U. S. 70, 77 (1973) ("The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings"); accord, Bram v. United States, 168 U. S. 532, 542-543 (1897); Counselman v. Hitchcock, 142 U. S. 547, 562 (1892). The principle extends to forbid policies which exert official compulsion that might induce a person into forfeiting his rights under the Clause. Lefkowitz v. Cunningham, 431 U. S. 801, 806 (1977) ("These cases settle that government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized"); accord, Uniformed Sanitation Men Assn., Inc. v. Commissioner of Sanitation of City of New York, 392 U. S. 280 (1968); Gardner v. Broderick, 392 U. S. 273, 279 (1968). JUSTICE SOUTER and JUSTICE THOMAS acknowledge a future privilege. Ante, at 2; ante, at 7-8. That does not end the matter. A future privilege does not negate a present right.
 
 
 132
 Their position finds some support in a single statement in United States v. Verdugo-Urquidez, 494 U. S. 259, 264 (1990) ("Although conduct by law enforcement officials prior to trial may ultimately impair that right [against compelled self-incrimination], a constitutional violation occurs only at trial"). That case concerned the application of the Fourth Amendment, and the extent of the right secured under the Self-Incrimination Clause was not then before the Court. Ibid. Furthermore, Verdugo-Urquidez involved a prosecution in the United States arising from a criminal investigation in another country, id., at 274-275, so there was a special reason for the Court to be concerned about the application of the Clause in that context, id., at 269 (noting the Court had "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States" (citing Johnson v. Eisentrager, 339 U. S. 763 (1950))). In any event, the decision cannot be read to support the proposition that the application of the Clause is limited in the way JUSTICE SOUTER and JUSTICE THOMAS describe today.
 
 
 133
 A recent case illustrates that a violation of the Self-Incrimination Clause may have immediate consequences. Just last Term, nine Justices all proceeded from the premise that a present, completed violation of the Self-Incrimination Clause could occur if an incarcerated prisoner were required to admit to past crimes on pain of forfeiting certain privileges or being assigned harsher conditions of confinement. McKune v. Lile, 536 U. S. 24 (2002); id., at 48 (O'CONNOR, J., concurring in judgment); id., at 54 (STEVENS, J., dissenting). Although there was disagreement over whether a violation occurred in the circumstances of that case, there was no disagreement that a present violation could have taken place. No Member of the Court suggested that the absence of a pending criminal proceeding made the Self-Incrimination Clause inquiry irrelevant.
 
 
 134
 This is not to say all questions as to the meaning and extent of the Clause are simple of resolution, or that all of the cited cases are easy to reconcile. Many questions about the application of the Self-Incrimination Clause are close and difficult. There are instances, moreover, when incriminating statements can be required from a reluctant witness, see, e.g., Gardner, supra, at 276, and others where information may be required even absent a promise of immunity, see, e.g., Shapiro v. United States, 335 U. S. 1, 19 (1948). JUSTICE SOUTER and JUSTICE THOMAS are correct to note that testimony may be ordered, on pain of contempt, if appropriate immunity is granted. It does not follow that the Clause establishes no present right. The immunity rule simply shows that the right is not absolute.
 
 
 135
 The conclusion that the Self-Incrimination Clause is not violated until the government seeks to use a statement in some later criminal proceeding strips the Clause of an essential part of its force and meaning. This is no small matter. It should come as an unwelcome surprise to judges, attorneys, and the citizenry as a whole that if a legislative committee or a judge in a civil case demands incriminating testimony without offering immunity, and even imposes sanctions for failure to comply, that the witness and counsel cannot insist the right against compelled self-incrimination is applicable then and there. JUSTICE SOUTER and JUSTICE THOMAS, I submit, should be more respectful of the understanding that has prevailed for generations now. To tell our whole legal system that when conducting a criminal investigation police officials can use severe compulsion or even torture with no present violation of the right against compelled self-incrimination can only diminish a celebrated provision in the Bill of Rights. A Constitution survives over time because the people share a common, historic commitment to certain simple but fundamental principles which preserve their freedom. Today's decision undermines one of those respected precepts.
 
 
 136
 Dean Griswold explained the place the Self-Incrimination Clause has secured in our legal heritage:
 
 
 137
 "The Fifth Amendment has been very nearly a lone sure rock in a time of storm. It has been one thing which has held quite firm, although something like a juggernaut has pushed upon it. It has, thus, through all its vicissitudes, been a symbol of the ultimate moral sense of the community, upholding the best in us, when otherwise there was a good deal of wavering under the pressures of the times." E. Griswold, The Fifth Amendment Today 73 (1955).
 
 
 138
 It damages the law, and the vocabulary with which we impart our legal tradition from one generation to the next, to downgrade our understanding of what the Fifth Amendment requires.
 
 
 139
 There is some authority, it must be acknowledged, for the proposition that the act of torturing to obtain a confession is not comprehended within the Self-Incrimination Clause itself. In Brown v. Mississippi, 297 U. S. 278 (1936), the Court held that convictions based upon tortured confessions could not stand, but it identified the Due Process Clause, and not the Self-Incrimination Clause, as the source for its ruling. Id., at 285. The Court interpreted the Self-Incrimination Clause as limited to "the processes of justice by which the accused may be called as a witness and required to testify. Compulsion by torture to extort a confession is a different matter." Ibid. The decision in Brown antedated the incorporation of the Clause and the ensuing understanding of its fundamental role in our legal system.
 
 
 140
 The views expressed by JUSTICE SOUTER and JUSTICE THOMAS also have some academic support. Professor McNaughton, in his revision of Professor Wigmore's treatise on the law of evidence, recites various rationales for the Self-Incrimination Clause, declaring all of them insufficient. 8 J. Wigmore, Evidence § 2251 (J. McNaughton rev. ed. 1961). The 11th justification he discusses is the prevention of torture, id., at 315, a practice Professor McNaughton simply assures us will not be revived, ibid.
 
 
 141
 This is not convincing. The Constitution is based upon the theory that when past abuses are forbidden the resulting right has present meaning. A police officer's interrogation is different in a formal sense from interrogation ordered by an official inquest, but the close relation between the two ought not to be so quickly discounted. Even if some think the abuses of the Star Chamber cannot revive, the specter of Sheriff Screws, see Screws v. United States, 325 U. S. 91 (1945), or of the deputies who beat the confessions out of the defendants in Brown v. Mississippi, is not so easily banished. See Oregon v. Elstad, 470 U. S. 298, 312, n. 3 (1985); id., at 371-372, n. 19 (STEVENS, J., dissenting).
 
 III
 
 142
 In my view the Self-Incrimination Clause is applicable at the time and place police use compulsion to extract a statement from a suspect. The Clause forbids that conduct. A majority of the Court has now concluded otherwise, but that should not end this case. It simply implicates the larger definition of liberty under the Due Process Clause of the Fourteenth Amendment. Dickerson, 530 U. S., at 433 ("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment"). Turning to this essential, but less specific, guarantee, it seems to me a simple enough matter to say that use of torture or its equivalent in an attempt to induce a statement violates an individual's fundamental right to liberty of the person. Brown, supra, at 285; Palko v. Connecticut, 302 U. S. 319 (1937); see also Rochin v. California, 342 U. S. 165 (1952). The Constitution does not countenance the official imposition of severe pain or pressure for purposes of interrogation. This is true whether the protection is found in the Self-Incrimination Clause, the broader guarantees of the Due Process Clause, or both.
 
 
 143
 That brings us to the interrogation in this case. Had the officer inflicted the initial injuries sustained by Martinez (the gunshot wounds) for purposes of extracting a statement, there would be a clear and immediate violation of the Constitution, and no further inquiry would be needed. That is not what happened, however. The initial injuries and anguish suffered by the suspect were not inflicted to aid the interrogation. The wounds arose from events preceding it. True, police officers had caused the injuries, but they had not done so to compel a statement or with the purpose of facilitating some later interrogation. The case can be analyzed, then, as if the wounds had been inflicted by some third person, and the officer came to the hospital to interrogate.
 
 
 144
 There is no rule against interrogating suspects who are in anguish and pain. The police may have legitimate reasons, borne of exigency, to question a person who is suffering or in distress. Locating the victim of a kidnaping, ascertaining the whereabouts of a dangerous assailant or accomplice, or determining whether there is a rogue police officer at large are some examples. That a suspect is in fear of dying, furthermore, may not show compulsion but just the opposite. The fear may be a motivating factor to volunteer information. The words of a declarant who believes his death is imminent have a special status in the law of evidence. See, e.g., Mattox v. United States, 146 U. S. 140, 152 (1892) ("The admission of the testimony is justified upon the ground of necessity, and in view of the consideration that the certain expectation of almost immediate death will remove all temptation to falsehood, and enforce as strict adherence to the truth as the obligation of an oath could impose"); see also Fed. Rule Evid. 804(b)(2) (providing an exception from the hearsay rule for certain statements uttered under belief of impending death). A declarant in Martinez's circumstances may want to tell his story even if it increases his pain and agony to do so. The Constitution does not forbid the police from offering a person an opportunity to volunteer evidence he wishes to reveal.
 
 
 145
 There are, however, actions police may not take if the prohibition against the use of coercion to elicit a statement is to be respected. The police may not prolong or increase a suspect's suffering against the suspect's will. That conduct would render government officials accountable for the increased pain. The officers must not give the impression that severe pain will be alleviated only if the declarant cooperates, for that, too, uses pain to extract a statement. In a case like this one, recovery should be available under § 1983 if a complainant can demonstrate that an officer exploited his pain and suffering with the purpose and intent of securing an incriminating statement. That showing has been made here.
 
 
 146
 The transcript of the interrogation set out by JUSTICE STEVENS, ante, at 1-4 (opinion concurring in part and dissenting in part), and other evidence considered by the District Court demonstrate that the suspect thought his treatment would be delayed, and thus his pain and condition worsened, by refusal to answer questions.
 
 
 147
 It is true that the interrogation was not continuous. Ten minutes of questions and answers were spread over a 45-minute interval. App. to Pet. for Cert. 27a. Treatment was apparently administered during those interruptions. The pauses in the interrogation, however, do not indicate any error in the trial court's findings and conclusions.
 
 
 148
 The District Court found that Martinez "had been shot in the face, both eyes were injured; he was screaming in pain, and coming in and out of consciousness while being repeatedly questioned about details of the encounter with the police." Id., at 22a. His blinding facial wounds made it impossible for him visually to distinguish the interrogating officer from the attending medical personnel. The officer made no effort to dispel the perception that medical treatment was being withheld until Martinez answered the questions put to him. There was no attempt through Miranda warnings or other assurances to advise the suspect that his cooperation should be voluntary. Martinez begged the officer to desist and provide treatment for his wounds, but the questioning persisted despite these pleas and despite Martinez's unequivocal refusal to answer questions. Cf. Mincey v. Arizona, 437 U. S. 385, 398 (1978) (Court said of similar circumstances: "It is hard to imagine a situation less conducive to the exercise of a rational intellect and a free will" (internal quotation marks omitted)).
 
 
 149
 The standards governing the interrogation of suspects and witnesses who suffer severe pain must accommodate the exigencies that law enforcement personnel encounter in circumstances like this case. It is clear enough, however, that the police should take the necessary steps to ensure that there is neither the fact nor the perception that the declarant's pain is being used to induce the statement against his will. In this case no reasonable police officer would believe that the law permitted him to prolong or increase pain to obtain a statement. The record supports the ultimate finding that the officer acted with the intent of exploiting Martinez's condition for purposes of extracting a statement.
 
 
 150
 Accordingly, I would affirm the decision of the Court of Appeals that a cause of action under § 1983 has been stated. The other opinions filed today, however, reach different conclusions as to the correct disposition of the case. Were JUSTICE STEVENS, JUSTICE GINSBURG, and I to adhere to our position, there would be no controlling judgment of the Court. In these circumstances, and because a ruling on substantive due process in this case could provide much of the essential protection the Self-Incrimination Clause secures, I join Part II of JUSTICE SOUTER's opinion and would remand the case for further consideration.
 
 
 151
 JUSTICE GINSBURG, concurring in part and dissenting in part.
 
 
 152
 I join Parts II and III of JUSTICE KENNEDY's opinion. For reasons well stated therein, I would hold that the Self-Incrimination Clause applies at the time and place police use severe compulsion to extract a statement from a suspect. See ante, at 2-11 (opinion concurring in part and dissenting in part). The evidence in this case, as JUSTICE KENNEDY explains, supports the conclusion "that the suspect thought his treatment would be delayed, and thus his pain and condition worsened, by refusal to answer questions." Ante, at 10. I write separately to state my view that, even if no finding were made concerning Martinez's belief that refusal to answer would delay his treatment, or Chavez's intent to create such an impression, the interrogation in this case would remain a clear instance of the kind of compulsion no reasonable officer would have thought constitutionally permissible.
 
 
 153
 In Mincey v. Arizona, 437 U. S. 385 (1978), appropriately referenced by JUSTICE KENNEDY, see ante, at 10, this Court held involuntary certain statements made during an in-hospital police interrogation.[1] The suspect questioned in Mincey had been "seriously wounded just a few hours earlier," and "[a]lthough he had received some treatment, his condition at the time of [the] interrogation was still sufficiently serious that he was in the intensive care unit." 437 U. S., at 398. He was interrogated while "lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus." Id., at 399. Despite the suspect's clear and repeated indications that he did not want to talk, the officer persisted in questioning him as he drifted in and out of consciousness. The Court thought it "apparent" in these circumstances that the suspect's statements "were not the product of his free and rational choice." Id., at 401 (internal quotation marks omitted).
 
 
 154
 Martinez's interrogation strikingly resembles the hospital-bed questioning in Mincey. Like the suspect in Mincey, Martinez was "at the complete mercy of [his interrogator], unable to escape or resist the thrust of [the] interrogation." Id., at 399 (internal quotation marks omitted). As JUSTICE KENNEDY notes, Martinez "had been shot in the face, both eyes were injured; he was screaming in pain, and coming in and out of consciousness while being repeatedly questioned about details of the encounter with the police." Ante, at 10 (quoting Martinez v. Oxnard, CV 98-9313 (CD Cal., July 31, 2000), p. 7, App. to Pet. for Cert. 22a). "In this debilitated and helpless condition, [Martinez] clearly expressed his wish not to be interrogated." Mincey, 437 U. S., at 399. Chavez nonetheless continued to question him, "ceas[ing] the interrogation only during intervals when [Martinez] lost consciousness or received medical treatment." Id., at 401. Martinez was "weakened by pain and shock"; "barely conscious, . . . his will was simply overborne." Id., at 401-402.
 
 
 155
 Thus, whatever Martinez might have thought about Chavez's interference with his treatment, I would agree with the District Court that "the totality of the circumstances in this case" establishes "that [Martinez's] statement was not voluntarily given." Martinez v. Oxnard, CV 98-9313, at 7, App. to Pet. for Cert. 22a; accord, Martinez v. Oxnard, 270 F. 3d 852, 857 (CA9 2001). It is indeed "hard to imagine a situation less conducive to the exercise of a rational intellect and a free will." Ante, at 10 (quoting Mincey, 437 U. S., at 398); see ante, at 1 (STEVENS, J., concurring in part and dissenting in part) (characterizing Martinez's interrogation as "the functional equivalent of an attempt to obtain an involuntary confession from a prisoner by torturous methods"); cf. 4 J. Wigmore, Evidence § 2251, p. 827 (1923) (noting about police interrogations common-law jurisprudence seeks to ward off: "It is far pleasanter to sit comfortably in the shade rubbing red pepper into a poor devil's eyes than to go about in the sun hunting up evidence." (emphasis deleted)).[2]
 
 
 156
 In common with the Due Process Clause, the privilege against self-incrimination safeguards "the freedom of the individual from the arbitrary power of governmental authorities." E. Griswold, The Fifth Amendment Today 51 (1955). Closely connected "with the struggle to eliminate torture as a governmental practice," id., at 3, the privilege is rightly regarded as "one of the great landmarks in man's struggle to make himself civilized," id., at 7. Its core idea is captured in the Latin maxim, "Nemo tenetur prodere se ipsum," in English, "No one should be required to accuse himself." Id., at 2. As an "expression of our view of civilized governmental conduct," id, at 9, the privilege should instruct and control all of officialdom, the police no less than the prosecutor.
 
 
 157
 Convinced that Chavez's conduct violated Martinez's right to be spared from self-incriminating interrogation, I would affirm the judgment of the Court of Appeals. To assure a controlling judgment of the Court, however, see ante, at 11 (KENNEDY, J., concurring in part and dissenting in part), I join Part II of JUSTICE SOUTER's opinion.
 
 
 
 Notes:
 
 
 [1]
 WhileMincey concerned admissibility under the Due Process Clause of the Fourteenth Amendment, its analysis of the coercive nature of the interrogation is nonetheless instructive in this case. See Dickerson v. United States, 530 U. S. 428, 433-434 (2000).
 
 
 [2]
 There was an eye witness, local farm worker Eluterio Flores, to the encounter between the police and Martinez. See Brief for Respondent 1; Defendants' Opposition to Plaintiff's Motion for Summary Adjudication of Issues, in Record for No. CV 98-9313 (CD Cal.), p. 3;id., at App. E (transcript of videotaped deposition of Eluterio Flores). The record does not reveal the extent to which the police interrogated Flores about the encounter.