IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 23, 2007

## ANTHONY DARRELL HINES v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Cheatham County
No. 9852     Robert E. Burch, Judge**

---

**No. M2006-02447-CCA-R3-PC - Filed January 29, 2008**

---

A Cheatham County jury convicted the Petitioner, Anthony Darrell Hines, of first-degree felony murder and sentenced him to death. After a remand to reconsider sentencing, the Tennessee Supreme Court affirmed a second sentence of death, and the United States Supreme Court denied certiorari. The Petitioner filed a petition for post-conviction relief in 1997, which was denied by the trial court and ultimately affirmed by this Court in 2004. The Petitioner filed this petition for post-conviction relief requesting permission and funds to test seven pieces of evidence for DNA. The trial court denied the petition, and, upon a thorough consideration of the facts and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and J.C. McLIN, J., joined.

Paul R. Bottei and Gretchen L. Swift, Nashville, Tennessee, for the Appellant, Anthony Darrell Hines.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Elizabeth T. Ryan, Assistant Attorney General, Senior Counsel; Dan M. Alsobrooks, District Attorney General; Dent Morris, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION
### I.  Facts

Because the facts of the case are again relevant, we include the following excerpt from the Tennessee Supreme Court's decision in 1988:

Between 1:00 and 1:30 p.m. on 3 March 1985 the body of Katherine Jean Jenkins was discovered wrapped in a sheet in Room 21 of the CeBon Motel off Interstate 40 at Kingston Springs. The victim was a maid at the motel and had been in the process of cleaning the room when she was killed. Her outer clothing had been pulled up to her breasts. Her panties had been cut or torn in two pieces and were found in another area of the room. A $20 bill had been placed under the wrist band of her watch.

The cause of death was multiple stab wounds to the chest. Four deep, penetrating wounds, ranging from 2.5 inches to 6.4 inches in depth, had been inflicted about the victim's chest with a knife similar to a butcher knife or a hunting knife. Other superficial cuts were found in the area of the neck and clavicle. There was also a knife wound which penetrated through the upper portion of the vagina into the mesentery in the lower part of the abdominal cavity. Dr. Charles Harlan who performed the autopsy on the victim's body testified that in view of the small amount of blood in the vaginal vault it was his opinion the wound occurred at or about the time of death. The victim also had what he described as "defensive wounds" on her hands and arms.

Jenkins had been left in charge of the motel at about 9:30 a.m. At that time the occupants of Rooms 9, 21 and 24 had not yet checked out. When the manager left her in charge she was given a Cheatham County State Bank bag containing $100 in small bills to make change for motel guests as they paid. The bank bag, bloody and empty, was discovered in the room with her body. It was her established habit to lock her automobile at all times and to keep her keys and billfold on her person when she worked. Her car keys, billfold and her 1980 silver-colored Volvo were missing.

On 1 March 1985 defendant had departed by bus from Raleigh, North Carolina. He had been given a non-refundable ticket to Bowling Green, Kentucky and $20 in spending money. The traveling time from Raleigh, North Carolina to Nashville, Tennessee was approximately 17 hours. Prior to his departure he was observed by a witness to be carrying a hunting knife in a sheath which was concealed beneath his shirt. The witness admonished him that he could not carry a knife like that on the bus to which he responded "I never go anywhere naked." "I always have my blade." Sometime in the early morning hours of 3 March 1985 he checked in and was assigned to Room 9 at the CeBon Motel. He was wearing a green army-type fatigue jacket, fatigue pants and boots. He was next seen at approximately 9:30 a.m. walking in a direction from his room toward a drink machine. At that time he told the manager he was not yet ready to check out. He was also seen sometime prior to 9:30 purchasing a sandwich at a deli-restaurant across the street from the motel. The same witness who saw defendant also saw another stranger there somewhere between 1:30 and 2:30 who she described as taller than defendant with dark hair, kinky looking and wild-eyed. He departed the restaurant in the general direction of the CeBon Motel. The C[he]atham County Sheriff testified that he responded to a call to the CeBon

2

Motel at 2:37 p.m. When he arrived on the scene blood spots in the room were beginning to dry and the body was beginning to stiffen. Defendant was seen between 11:00 and 11:30 a.m. walking from the direction of the Interstate toward the CeBon Motel. At 12:40 p.m. a witness saw the victim's Volvo automobile pulling out from the CeBon Motel driveway. It was being operated by a person who appeared to be a man with very short, light colored hair. The vehicle crossed over the Interstate and turned east on Interstate 40. She followed behind and endeavored to catch up but it sped off toward Nashville at a high rate of speed. Defendant was next identified in possession of the car a few miles past Gallatin on Interstate 65, heading in the direction of Bowling Green, Kentucky. A group of young people first endeavored to help him start the stalled automobile and then gave him a ride to Bowling Green. During the trip to Bowling Green one of these witnesses observed some dried blood on the right shoulder of his shirt. He carried a jacket which he kept folded. After he arrived at his sister's home in Bowling Green defendant told her he had endeavored to pay another day's rent at a motel when he was attacked by the motel operator. He demonstrated to her how he had stabbed the man. He also related to her he had a sum of money. She could not remember whether he said $35,000 or $3,500. Defendant also told his sister's husband he had earned approximately $7,000 working as a mechanic in North Carolina. He displayed a set of keys to a Volvo automobile and explained that a man who had given him a ride attempted to rob him. Defendant purportedly grabbed the steering wheel and when the car ran off the road he grabbed the keys and ran. According to the witness he was wearing an army fatigue jacket which had something large, heavy and bulky in the pocket. The witness had previously seen defendant with a survival knife with a 6 1/2 to 7 inch blade hanging from his belt. When defendant was taken into custody he volunteered the statement that he had taken the woman's car but had not killed her. According to the arresting officer he had not advised the defendant that a woman had been killed prior to the volunteered statement. There was evidence however that defendant was aware he had been charged in Tennessee on a murder warrant. The victim's wallet was found wrapped in a thermal underwear shirt a short distance from where her car was found abandoned. The key to Room 9 of the CeBon Motel was found at the site where defendant had been camping out near Cave City, Kentucky. When asked by a TBI agent to tell the truth about the death of Katherine Jenkins[,] defendant stated that if the officer could guarantee him the death penalty he would confess and tell him all about the murder and that he could tell him everything he wanted to know if he was of a mind to. There were marks on the wall of Room 9 at the CeBon Motel apparently made by someone stabbing a knife into the wall. When shown photographs of the marks on the wall defendant responded that they were knife marks. These marks were obviously made by a knife larger than two taken from defendant at the time of his arrest.

There is additional evidence in the record incriminating defendant. That summarized above establishes guilt of the conviction offense. A criminal offense may be

established exclusively by circumstantial evidence and the record in this case is abundantly sufficient for a rational trier of fact to find defendant's guilt beyond a reasonable doubt.

*State v. Hines*, 758 S.W.2d 515, 517-19 (Tenn. 1988). At a re-sentencing hearing, the following additional evidence was presented:

The State introduced proof that the [D]efendant had previously been convicted of assault in the first degree. A detective who had investigated the case testified that the defendant had inflicted serious physical harm to the victim in this prior case. The State also presented proof that the defendant had stabbed the victim in the present case multiple times with a sharp instrument, probably a knife. Three of these wounds were lethal and had penetrated the victim's chest five to six inches. The pathologist who had performed the autopsy of the victim testified that all the lethal wounds were inflicted at about the same time and that death would have occurred within four to six minutes, most of which time the victim would have remained conscious. Defensive wounds were found on the victim's hands. Her clothing had been pulled up and her panties had been cut in half and removed from her body. About the time of death, and shortly after the infliction of the lethal wounds to the chest, the defendant had inserted a flat object through the victim's vaginal orifice into the vaginal pouch until the instrument penetrated the vaginal dome and passed into the abdominal cavity. A twenty dollar bill had been placed under the victim's watchband. No semen or any other evidence of ejaculation was found.

At the time of her death, the victim had in her possession a bank bag containing approximately $100 in proceeds from the motel. The empty bag was discovered in the room where the victim's body was found. The victim's automobile was also missing. Around 12:40 p.m. the day of the murder, another employee of the motel saw the vehicle being driven out of the motel parking lot by someone other than the victim.

In mitigation, the defendant presented proof that, while in prison on this conviction, he had presented no serious disciplinary problems and posed no threat to the prison population. The defendant also presented proof of a troubled childhood. His father had abandoned the family when the defendant was young. His mother had an alcohol problem. In his teens the defendant became involved in sniffing gasoline and glue and began to abuse alcohol and drugs. He also exhibited self-destructive behavior. Dr. Pamela Auble, a clinical psychologist, testified that the defendant was suffering from a paranoid personality disorder and dysthymia, or chronic depression. According to Dr. Auble, the defendant would suppress his feelings until they "boiled up" under stress. In her opinion, the defendant, who had returned from turbulent visits with his parents and girlfriend shortly before he committed the murder, was under stress when he killed the victim. Dr. Ann Marie Charvat, a sociologist, also

4

testified about the damaging effect of the circumstances of his childhood on the defendant.

*State v. Hines*, 919 S.W.2d 573, 577 (Tenn. 1995).

At his most recent post-conviction hearing, the Petitioner requested the following items be tested for DNA evidence: (1) The victim's underwear; (2) The victim's dress; (3) The victim's slip; (4) The bloody bank bag found in the room; (5) A cigarette butt found in Room 21; (6) A $20 bill found on the victim; and (7) A plastic spray bottle found in Room 21.

The Petitioner asserted that he is entitled to testing under Tennessee Code Annotated sections 40-30-304 and -305. The post-conviction court determined that three of the four requirements for testing under each statutory section had been met. However, the Petitioner had not shown that there was a reasonable probability that the Petitioner would not have been prosecuted or convicted, T.C.A. § 40-30-304 (2006), or that the Petitioner's verdict or sentence would have been more favorable, T.C.A. § 40-30-305 (2006), if exculpatory results were obtained through DNA analysis. Thus, the post-conviction court denied the petition. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner raises the following three issues: (1) the post-conviction court failed to address the Petitioner's claims under Tennessee Code Annotated section 30-40-305; (2) the post-conviction court erroneously found the Petitioner failed to meet the requirements of the DNA statutes; and (3) the Petitioner is entitled to DNA testing on constitutional grounds.

### A. Section 40-30-305

Initially, the Petitioner argues that the post-conviction court failed to address the availability of relief under section -305. Thus, the Petitioner asserts that the case should be remanded for a determination under that section. The Petitioner is correct in noting that the court only addressed section -304 in its oral decision at the hearing. However, the trial court determined in its written order that the Petitioner failed to do the following:

> [E]stablish either that a reasonable probability exists that the Petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis or *that a reasonable probability exists that analysis of the evidence will produce DNA results which would have rendered the Petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction*. (Emphasis added).

The second portion of the quote is language taken directly from the section -305 statute. *See* T.C.A. § 40-30-305.

The Petitioner argues that, because the oral statement and the written statement conflict, and the State drafted the written statement, the oral statement should control. We cannot agree. In our view, the post-conviction court speaks through its written orders. *See* T.C.A. § 40-30-111(b) ("Upon the final disposition of every petition, the court shall enter a final order, and except where proceedings for delayed appeal are allowed, shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each ground."). We acknowledge that the State appears to have drafted an order not totally in compliance with the post-conviction court's oral statement, but we presume the court read the order and agreed with it before signing it. We conclude that a remand for a determination under section -305 is not necessary.

### B. DNA Testing Pursuant to Sections -304 & -305

The Post-Conviction DNA Analysis Act provides:

[A] person convicted of and sentenced for the commission of first degree murder, second degree murder, aggravated rape, rape, aggravated sexual battery or rape of a child, the attempted commission of any of these offenses, any lesser included offense of these offenses, or, at the direction of the trial judge, any other offense, may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

T.C.A. § 40-30-303 (2006). Under the Post-Conviction DNA Analysis Act, the trial court, after affording the prosecution the opportunity to respond, must order a DNA analysis if it finds the following:

(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-304 (2006). Additionally, we note that a court *may* order DNA analysis if it finds the following:

(1) A reasonable probability exists that analysis of the evidence will produce DNA results which would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction . . . .

T.C.A. § 40-30-305(1). We note that sections 2, 3 and 4 of § 40-30-305 are identical to sections 2, 3, and 4 of §40-30-304.

The scope of our review is limited, as the post-conviction court is given considerable discretion in deciding whether the Petitioner is entitled to relief under the Post-Conviction DNA Analysis Act. *See Jack Jay Shuttle v. State*, No. E2003-00131-CCA-R3-PC, 2004 WL 199826, at *4 (Tenn. Crim. App., at Knoxville, Feb. 3, 2004), *perm. app. denied* (Tenn. Oct. 4, 2004). Therefore, this Court will not reverse the post-conviction court unless its judgment is not supported by substantial evidence. *State v. Hollingsworth*, 647 S.W.2d 937, 938 (Tenn. 1983); *see Willie Tom Ensley v. State*, No. M2002-01609-CCA-R3-PC, 2003 WL 1868647, at *4 (Tenn. Crim. App., at Nashville, Apr. 11, 2003), *no perm. app. filed*.

First degree murder is among the crimes for which a petitioner may request, at any time, DNA analysis of any evidence in possession of the prosecution or laboratory. T.C.A. § 40-30-303. The trial court must order DNA analysis of such evidence only if a petitioner satisfies all of the statutory requirements. T.C.A. § 40-30-304. "The absence of any one of the four statutory conditions results in the dismissal of the petition." *Sedley Alley v. State*, No. W2004-01204-CCA-R3-PD, 2004 WL 1196095, at *2 (Tenn. Crim. App., at Jackson, May 26, 2004), *perm. app. denied* (Tenn. Oct. 4, 2004); *accord William D. Buford v. State*, No. M2002-02180-CCA-R3-PC, 2003 WL 1937110, at *6 (Tenn. Crim. App., at Nashville, Apr. 24, 2003), *no perm. app. filed*.

In addressing the "reasonable probability" requirements of both sections (1), a court should consider the following:

[A]ll the evidence available, including the evidence at trial and/or any stipulations of fact by the petitioner or his counsel and the state. In addition, the opinions of the appellate courts on either the direct appeal of the conviction or the appeals in any previous post-conviction or habeas corpus actions may provide some assistance.

*Mark A. Mitchell v. State*, No. M2002-01500-CCA-R3-PC, 2003 WL 1868649, *5 (Tenn. Crim. App., at Nashville, Apr. 11, 2003), *perm. app. denied* (Tenn. Oct. 13, 2003); *accord Easley*, 2003 WL 1868647, at *4. Although the DNA test results can be compared to a petitioner, "The statute does not authorize the trial court to order the victim to submit new DNA samples years after the offense nor does the statute open the door to any other comparisons the petitioner may envision." *Earl David Crawford v. State*, No. E2002-02334-CCA-R3-PC, 2003 WL 21782328, at *3 (Tenn. Crim. App., at Knoxville, Aug 4, 2003), *perm. app. denied* (Tenn. Dec. 22, 2003). However, as noted in *Shuttle v. State*, "[T]he Act requires the trial court to assume that the DNA analysis will reveal exculpatory results in the court's determination as to whether to order DNA testing . . . . The

Act was created because of the possibility that a person has been wrongfully convicted or sentenced." 2004 WL 199826, at *5 (quoting *Ricky Flamingo Brown, Sr. v. State*, No. M2002-02427-CCA-R3-PC, 2003 WL 21362197, at *2 (Tenn. Crim. App., at Nashville, June 13, 2003), *perm. app. denied* (Tenn. Oct. 6, 2003)).

The trial court determined that the Petitioner had shown requirements (2), (3), and (4) under both statutes. However, the trial court determined that the Petitioner failed to adequately prove requirement (1) under either statute. As "[t]he failure to meet any of the qualifying criteria is, of course, fatal to the action[,]" we will first address requirement (1). *Buford*, 2003 WL 1937110, at *6.

The State's evidence against the Petitioner consisted of accounts of the Petitioner driving away from the motel in the victim's car and accounts of the Petitioner carrying a large hunting knife. Additionally, the Petitioner had $20 in spending money, and a $20 bill was left under the victim's watchband. Witnesses saw dried blood on the Petitioner's shirt, and, when he arrived in Kentucky, he explained how he had stabbed a male motel operator who attacked him. The Petitioner also explained to his sister that he obtained the victim's car by grabbing the steering wheel and keys after an unidentified driver attempted to rob him. When taken into custody, before the arresting officer explained that the victim had been killed, the Petitioner admitted taking the victim's car but denied killing the victim. The victim's wallet was found a short distance from where her car was found abandoned. When questioned by police, the Petitioner stated that, if they could guarantee the death penalty, he would tell them all they wanted to know.

As we are required to presume the tests would be exculpatory, the question is whether these exculpatory results would form a reasonable probability that the Petitioner would not have been prosecuted or convicted – for mandatory testing – or that there is a reasonable probability that the Petitioner's verdict or sentence would have been more favorable – for discretionary testing. We conclude that the post-conviction court did not abuse its discretion in determining that, even if the DNA evidence were found to be exculpatory, the Petitioner would have still been prosecuted and convicted, and his sentence and verdict would not be any more favorable.

Initially, there does not appear to be any evidence that this was a rape where sperm might be present on the victim. The victim was raped with a knife. However, even if sperm could be found on the victim's underwear, dress, and slip, and that sperm was identified with another man, that discovery does not preclude the prosecution and conviction of the Petitioner. It may simply mean the Petitioner was assisted by another man in the murder. Further, the Petitioner points to a cigarette butt, a spray bottle, a $20 bill, and a bloody bank bag. Again, even if all these items contained the DNA of another person, we still cannot find an abuse of discretion on the part of the post-conviction court. The State's theory might slightly change, but we are confident that the Petitioner would still have been prosecuted for the victim's murder.

The Petitioner may have a right to testing if the existence of exculpatory DNA evidence raises a reasonable probability that he would not have received the death penalty or been convicted

8

of first-degree murder, as opposed to a lesser crime. However, again we cannot find an abuse of discretion by the post-conviction court. At best, if all this evidence were tested, and every piece of evidence revealed the presence of another person's DNA, the State might seek out another individual who likely assisted the Petitioner in the murder of the victim. In our view, the jury would have still convicted the Petitioner of first-degree murder.

We also note that the State contests the post-conviction court's determination that many of the objects have met requirement (2), that "[t]he evidence is still in existence and in such a condition that DNA analysis may be conducted." T.C.A. § 40-30-304(2), -305(2). The Petitioner has not made any showing that there is any semen on the victim's dress, underwear, or slip. The Petitioner only cites to his own *request* for a toxicology report in support of his contention. We find no evidence to support a contention that semen is "in existence." In fact, the State presented evidence at a sentencing hearing that there was no semen found at the scene. When these three pieces of evidence are removed from consideration, the Petitioner's "cumulative effect" argument become much weaker. The Petitioner is left to rely on the cigarette butt, the plastic spray bottle, the $20 bill, and the bloody bank bag. In our view, there is not a reasonable probability that another person's DNA on these four pieces of evidence would have changed the outcome of the trial or the Petitioner's sentence. The Petitioner is not entitled to relief on this issue.

## C. Constitutional Grounds for Testing

Finally, the Petitioner argues that he is entitled to DNA testing under the Eighth and Fourteenth Amendments to the United States Constitution. Specifically, he argues he had a procedural due process right, a substantive due process right, a right under *Brady v. Maryland*, and a right under general Eighth Amendment principles to DNA testing. The State argues that, although no Tennessee court has ruled on this issue, the Sixth Circuit affirmed a district court's determination that petitioners have no procedural or substantive due process rights to DNA testing, no rights under *Brady*, and no Eighth Amendment rights. *See Alley v. Key*, 431 F. Supp. 2d 790, 800, 804 (W.D. Tenn. 2006), *aff'd,* 2006 WL 1313364 (6th Cir. May 14, 2006) (not for publication). We will address each argument individually.

## 1. Procedural Due Process

Claims of right under Procedural Due Process fall under the balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976). This test applies when the government has deprived a person of life, liberty, or property. The *Mathews* balancing test looks to:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

9

*Id.* at 335. Like the Petitioner here, the *Alley* petitioner argued that he was entitled to DNA testing because "[h]is right to life is paramount, the release of evidence for DNA testing is of exceptional value because it will provide the most accurate determination of [his] innocence, and there is no burden on the government." *Alley*, 431 F. Supp. 2d at 801 (quotations omitted). The *Alley* court declined to grant relief under *Mathews* because there is "no state law right to the evidence." *Id*. Further, the *Alley* court stated, "he cannot demonstrate that the life interest which he asserts bestows upon him 'the post-conviction legal right to access or discover the evidence relating' to his conviction." *Id*. We agree with the district court's opinion, affirmed by the Sixth Circuit, that post-conviction petitioners have no right to evidence or that any life interest grants such a right. The Petitioner is not entitled to relief under *Mathews*.

## 2. Substantive Due Process

Next, the Petitioner argues that withholding DNA evidence "shocks the conscience" such that he is entitled to relief based on substantive due process. *See Rochin v. California*, 342 U.S. 165, 172 (1952). The Petitioner argues that we should apply strict scrutiny because his "right to life," a fundamental right, is at stake. The Petitioner cites *Washington v. Gluksberg*, 521 U.S. 702 (1997), and *Chavez v. Martinez*, 538 U.S. 760 (2003), for this proposition. *Gluksberg* addressed assisted suicide, 521 U.S. at 705, while *Chavez* addressed police questioning, 538 U.S. at 775. Neither of these cases specifically state or, in our view, stand for the proposition that a petitioner is entitled to DNA testing pursuant to substantive due process. Furthermore, *Chavez* stated, "Only fundamental rights and liberties which are deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty qualify for such protection." *Id*. (quotations omitted). The Petitioner cites no case that has held DNA testing rises to such a level.

In addressing this same question, the *Alley* court opined that "[t]he operative inquiry confronting a court considering a substantive due process claim premised on the alleged 'conscience shocking' behavior of some state official is whether her power is wielded egregiously or as an 'instrument of oppression.'" *Alley*, 431 F. Supp. 2d at 801 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998)). The State has not committed any acts that shock the conscience, as it has merely acted in accordance with state and federal law regarding safekeeping and access. The Petitioner is not entitled to relief on this issue.

## C. *Brady* Violation

The Petitioner next argues that *Brady v. Maryland* requires the release of this evidence. 373 U.S. 83 (1963). However, *Brady* applies to evidence that is plainly exculpatory. *State v. Ferguson*, 2 S.W.3d 912, 915 (Tenn. 1999); *see Brady*, 373 U.S. at 87 ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *United States v. Agurs*, 427 U.S. 97, 110-11 (1976) ("[T]here are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request. For though the attorney for the sovereign must

prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that justice shall be done."). Because this evidence is not plainly exculpatory, *Brady* is inapplicable. *See Alley*, 431 F. Supp. 2d at 802-03.

## D. Eighth and Fourteenth Amendments

Finally, the Petitioner cites to the Eighth and Fourteenth Amendments for the proposition that the Constitution does not tolerate the execution of innocents. *See Herrera v. Collins*, 506 U.S. 390, 419 (1993) (Kennedy & O'Connor, JJ., concurring). Although this Court may agree, the Petitioner has not cited to any other authority upon which this Court might base a grant of relief. *See Alley*, 431 F. Supp. 2d at 803-04 ("Plaintiff's Eighth Amendment claims do not establish a constitutional right to the evidence."). The Petitioner is not entitled to relief.

## III. Conclusion

Based on the foregoing reasoning and authorities, we conclude that the Petitioner is not entitled to post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE