# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANTHONY W. SMITH; TERESA SMITH,
*Plaintiffs-Appellants,*

v.

ROBERT ALMADA, Santa Monica
Police Sergeant,
*Defendant-Appellee.*

Nos. 09-55334
09-55346

D.C. No.
2:06-cv-1626-AHM

OPINION

On Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
June 9, 2010—Pasadena, California

Filed October 19, 2010

Before: Dorothy W. Nelson and Ronald M. Gould,
Circuit Judges, and James S. Gwin, District Judge.*

Opinion by Judge Gwin;
Dissent by Judge D.W. Nelson

---

*The Honorable James S. Gwin, United States District Judge for the
Northern District of Ohio, sitting by designation.

17221

**COUNSEL**

Brett J. Votterro, Springfield, Massachusetts, for the appellant.

Anthony P. Serritella, Deputy City Attorney, Santa Monica, California, for the appellee.

**OPINION**

GWIN, District Judge:

Plaintiffs Anthony Smith and his wife Theresa Smith appeal the district court's grant of summary judgment to Defendant Santa Monica Police Sergeant Robert Almada on

Smith's claims for false arrest, malicious prosecution, and suppression of exculpatory evidence and on Theresa Smith's substantive due process claim for deprivation of familial relations.[1] In support of his action against Almada, Smith claims that Sergeant Almada failed to disclose materially exculpatory evidence in Smith's criminal arson trial—including a demonstrably false identification by a key witness against Smith. Although Smith's first trial resulted a mistrial after the jury was unable to reach a verdict, he says that access to the exculpatory evidence would have resulted in an acquittal in the first trial, rather than a mistrial. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

# I

In the early morning hours of February 13, 2003, a fire started inside Simply Sofas, a furniture store owned by Marilyn Nelson. The fire and smoke largely destroyed the store's inventory, causing more than $2.8 million in damage.

After investigating, fire inspectors determined that an arsonist used three five-gallon water bottles filled with gasoline and stuffed with rolled-up periodicals, newspapers, and other gasoline-soaked mail as "firebombs" to start the fire. Under the melted remains of one bottle, the investigators also found an irregularly shaped piece of asphalt that matched a hole in the alley across the street from the furniture store. The investigators concluded that the arsonist had broken the store window, likely with the asphalt, and placed the gasoline-filled bottles on a table just inside the window.

The gasoline-soaked papers that the investigators found inside the melted bottles included numerous pieces of mail addressed to Appellants Smith's residence over a five-year

---

[1]The parties agree that Teresa Smith's claim is entirely dependent on the survival of her husband's claims. Because we affirm the dismissal of Smith's claims, we also affirm the dismissal of his wife's claims.

period, including: a July 1997 U.S. News magazine addressed to Anthony Smith, a December 1999 U.S. News magazine addressed to Anthony Smith, a January 2000 Motorcycle Rider magazine addressed to Anthony Smith, a 2002 tenant notice issued by Smith's apartment complex, a 2002 express mail envelope signed for by Anthony Smith, a Fall/Winter 2002 JC Penney catalog addressed to "Aundrea Smith," a University of Alabama envelope addressed to Anthony Smith, a March of Dimes envelope addressed to Anthony Smith, a handwritten greeting card addressed to "the beloved Smith family," a Rochester Clothing catalog addressed to Teresa Smith, a Los Angeles Music Center mailer addressed to Anthony Smith, and a Mark Taper Forum mailer addressed to Anthony Smith. The investigators also found the burnt business card of a Beverly Hills woman who worked for Smith.

Soon after the fire was under control, Defendant Santa Monica Police Sergeant Robert Almada took over the investigation. Almada had investigated four previous fires set in dumpsters behind Nelson's stores in October and November 2002. One of those fires had been started with contraptions similar to the firebombs that started the February 2003 fire, yet witnesses to those earlier fires (including store owner Nelson) described different suspects, none resembling Smith.

In his investigation of the February 2003 fire, Sergeant Almada interviewed Nelson, who said that she, her daughter and son-in-law (both business partners in the store with Nelson), and a clerk had keys to the store. Nelson told Sergeant Almada that she and her son-in-law had closed the store early the evening of the fire and that her son-in-law had locked all of the doors.

According to Nelson, her business was in healthy financial condition: Annual sales were approximately $3 million, with profits around $400,000. The store had almost no debt. Nelson said she had never made a business- or fire-related insur-

ance claim. Nelson did, however, receive insurance proceeds for the February 2003 fire.

At the time of the initial interview, Sergeant Almada asked Nelson if she could think of anyone with a motive for the arson. Nelson mentioned a former employee whom she had recently fired and a few other names, but not Smith.

Given that a large amount of Smith's mail received over a long period of time had been used as a wick to start the fire, Sergeant Almada began to focus his investigation on Smith. Almada questioned Smith, who described selling items on consignment through Nelson's store and stated that he and Nelson had a "minor issue" in January 2003 arising out of a broken item and a stop-payment order that Nelson had placed on a check paid to Smith.

Sergeant Almada then circled back to speak with Nelson. After Almada told Nelson that Smith was a suspect, Nelson described an "uncomfortable and tense" January 2003 dispute with Smith. The dispute centered over whether a consigned item was damaged before or after being given to Nelson. Nelson said that when Smith dropped by her store to pick up a consignment check, she told Smith that one of his consignment items had been broken before Smith delivered it to Nelson's store, and that she would not pay him the full amount for the item. But Smith claimed that one of Nelson's employees had broken the item and demanded that Nelson pay for it. Nelson said that Smith's demeanor was threatening and frightening and that he stuck his finger in her face. To end the dispute, Nelson promised to give Smith an additional check for the broken item. Later, Smith's assistant called Nelson and said that Smith had lost the first check, so Nelson wrote Smith a second check for the value of the original consignment check plus the value of the broken item. Nelson then explained that after learning that Smith had cashed the first check, she stopped payment on the second check. Nelson said

she felt that Smith was trying to intimidate her into paying more than she owed him.

In addition—and central to Smith's claims against Sergeant Almada—Nelson claimed to have seen Smith in front of her boarded-up store on the afternoon of June 28, 2003, "laughing and smiling" as he pointed to the area of the fire's origin. However, Sergeant Almada's investigation ultimately showed that Nelson's statement was false: Sergeant Almada viewed a security tape from Smith's apartment building showing that Smith was at home on June 28, 2003, the day Nelson claimed to have seen him.

Nevertheless, armed with Nelson's statement, Sergeant Almada confronted Smith with the evidence against him. According to Sergeant Almada, upon learning of the scale of the fire and the evidence against him, Smith slumped over, began to cry, and apologized repeatedly. Smith recalls the conversation differently, claiming that Sergeant Almada told him that firefighters had been fatally injured in the fire and that he cried and said he was sorry for their death but never said that he had been involved. Smith could not explain how his mail from a five-year period ended up in the firebombs but continued to deny involvement in the fire. Sergeant Almada did not arrest Smith at that time.

Instead, Sergeant Almada met with deputy district attorney Jean Daly to discuss the case against Smith. Although Daly does not recall discussing the prior dumpster fires behind Nelson's store, Sergeant Almada claims that he mentioned them to prosecutor Daly but said he doubted that they were related to the February 2003 fire. Sergeant Almada did not tell Daly about Nelson's false report of Smith's gloating. After hearing Sergeant Almada's account of the evidence against Smith, Daly recommended that Sergeant Almada obtain a warrant for Smith's arrest.

Consequently, Sergeant Almada sought an arrest warrant from Los Angeles Superior Court Judge Richard Neidorf,

who signed the warrant. Sergeant Almada then arrested Smith, and prosecutor Daly filed a criminal complaint charging Smith with arson. Smith did not make bail after his arrest and remained in jail through his first trial in June 2004.

At Smith's first trial, Nelson testified that her January 2003 dispute with Smith "shocked" and "intimidated" her. She said that Smith looked at her in a "very threatening" manner and "pushed his finger and almost to my face," and that as a result she was "frightened" and "very intimidated." Smith's defense attorney attempted to introduce evidence of the October 2002 dumpster fire—which predated Smith's altercation with Nelson—but the trial court granted the prosecution's motion *in limine* to exclude the evidence.

At the conclusion of the first trial, the jury could not reach a verdict, with five jurors voting "guilty" and seven jurors voting "not guilty."

After the court declared a mistrial, Daly reviewed the case with the head deputy district attorney, who approved Daly's recommendation to retry the case. Smith remained in custody.

At Smith's second trial in December 2004, on substantially the same evidence, the jury again could not reach a verdict, this time with one juror voting to convict and eleven jurors voting to acquit. The trial court then dismissed the case against Smith under California Penal Code § 1385, finding that although "there are certainly strong inferences to suggest that Mr. Smith did this," the prosecution would never be able to obtain a unanimous verdict. Only after this dismissal was Smith released from custody.

Thereafter, the Smiths sued Sergeant Almada under 42 U.S.C. § 1983 for false arrest, malicious prosecution, and failure to disclose exculpatory evidence. After discovery, the district court granted Sergeant Almada's summary judgment motion. On the false arrest claim, the district court held that

Sergeant Almada was entitled to qualified immunity because a competent officer could reasonably have determined that probable cause existed to arrest Smith for arson. On the malicious prosecution claim, the district court concluded that Sergeant Almada did not knowingly submit material false information to the prosecution. Finally, on the failure to disclose exculpatory evidence claim, the district court held that the allegedly withheld evidence—the fact that Nelson's testimony about Smith's gloating at the crime scene was false—would not have materially affected Smith's trial.

This timely appeal followed.

## II

We review *de novo* a district court's grant of summary judgment. *See, e.g.*, *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). Accordingly, we must determine, viewing the evidence in the light most favorable to Smith, whether any genuine issues of material fact exist and whether the district court correctly applied the substantive law. *Id.* at 922.

## A

Smith's first claim—which the district court dismissed on qualified immunity grounds—is that Sergeant Almada violated his Fourth Amendment rights by arresting him without probable cause.

Although a private party may bring a § 1983 claim for an arrest pursuant to an improperly issued arrest warrant, *see Malley v. Briggs*, 475 U.S. 335, 342 (1986), qualified immunity shields the arresting officer from suit when he or she "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The doctrine immunizes reasonable mistakes, thus freeing officers to

"make difficult decisions in challenging situations" without allowing fear of liability to "disrupt[ ] the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

In a garden-variety false arrest claim challenging the probable cause for an arrest, if the arrest warrant is facially valid, the arresting officer enjoys qualified immunity unless "the warrant application is so lacking in indicia of probable cause as to render official belief in its existing unreasonable . . . ." *Malley*, 475 U.S. at 344-45; *see also KRL v. Estate of Moore*, 512 F.3d 1184, 1190 (9th Cir. 2008) ("[A]n officer who prepares or executes a warrant lacking probable cause is entitled to qualified immunity unless no officer of reasonable competence would have requested the warrant."). Here, however, Smith does not contend that Sergeant Almada's warrant application lacked probable cause on its face. Instead, Smith argues that Sergeant Almada misled the magistrate judge when applying for the warrant, and that had the magistrate considered all of the facts, the magistrate would not have found probable cause.

**[1]** To maintain a false arrest claim for judicial deception, a plaintiff must show that the officer who applied for the arrest warrant "deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004). The materiality element—a question for the court, *see id.*—requires the plaintiff to demonstrate that "the magistrate would not have issued the warrant with false information redacted, or omitted information restored." *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1126 (9th Cir. 1997). For example, in *Ewing v. City of Stockton*, 588 F.3d 1218 (9th Cir. 2009), we concluded that a warrant application's two false statements about the plaintiff were not material because an independent, reliable source's detailed description of the incident and identification of the plaintiff at the scene were sufficient to establish probable cause. *Id.* at 1224-25. And in

*Lombardi*, although a drug search warrant application failed to mention that the two confidential informants—whose statements were the only evidence that the plaintiff had drugs in his home—had axes to grind with the plaintiff, we nevertheless held that the omitted information was immaterial because the informants' statements were given independently, were detailed, were based on personal observation, were corroborated by one another, and were against one informant's penal interests. 117 F.3d at 1126-27.

Here, Smith contends that the magistrate would not have issued the arrest warrant if Sergeant Almada's warrant application had not included false representations—that Nelson had independently recalled her dispute with Smith and that Smith's tearful apologies were a tacit admission to the crime —but instead had included (1) the details of the four dumpster fires predating Smith's altercation with Nelson, (2) the other suspects in the February 2003 fire, and (3) the fact that Nelson falsely claimed to have seen Smith gloating at the crime scene several months after the fire.

**[2]** Yet even if Sergeant Almada falsified and omitted this information (as Smith contends), the corrected report and warrant application would still have contained a core set of facts sufficient to establish probable cause to arrest Smith for arson. First, even without Nelson's testimony about the payment dispute with Smith over his consigned items less than one month before the fire—which would have been less credible in light of her demonstrably false report about Smith's gloating—Sergeant Almada's corrected report still would have contained Smith's own admission of the dispute. And Sergeant Almada's corrected report would still have recounted that the firebombs contained numerous pieces of mail addressed over a five-year period to Smith and his wife at their residence—a fact that Smith could not explain to Almada or at trial. This evidence linking Smith to the fire was sufficient to overcome any negative inferences the magistrate might have drawn from the earlier dumpster fires.

**[3]** These facts, together with the evidence of a motive, gave probable cause to believe that Smith was guilty of arson. Thus, because the changes suggested by Smith to Sergeant Almada's warrant application do not compel the conclusion that "a neutral magistrate would not have issued the warrant," *Lombardi*, 117 F.3d at 1126, we conclude that the district court properly granted summary judgment against Smith on his false arrest claim.

## B

Smith's second claim is that Sergeant Almada's false statements and failure to disclose material information to the prosecutor caused Smith's malicious prosecution.

**[4]** A criminal defendant may maintain a malicious prosecution claim not only against prosecutors but also against others—including police officers and investigators—who wrongfully caused his prosecution. *See Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002). To maintain a § 1983 action for malicious prosecution, a plaintiff must show that "the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her [a] specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995); *see also Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054-55 (9th Cir. 2009) ("[P]robable cause is an absolute defense to malicious prosecution.").

**[5]** As explained above, even after correcting for the allegedly false and omitted information in Sergeant Almada's warrant application, probable cause supported Smith's arrest for arson. For the same reason, probable cause supported Smith's prosecution. Thus, the district court correctly granted summary judgment for Sergeant Almada on Smith's malicious prosecution claim.

## C

Smith's final claim is that Sergeant Almada violated his due process rights by failing to disclose material exculpatory evidence—in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

### 1

**[6]** *Brady* requires both prosecutors and police investigators to disclose exculpatory evidence to criminal defendants. *See Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1087 (9th Cir. 2009) (allowing § 1983 claim against police inspector for *Brady* violation). To state claim under *Brady*, the plaintiff must allege that (1) the withheld evidence was favorable either because it was exculpatory or impeaching, (2) the evidence was suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). As to the prejudice prong, the Supreme Court has stated that "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281.

Here, Smith contends that Sergeant Almada should have disclosed the description of suspects given in the four previous dumpster fires—none of which matched Smith—and Nelson's demonstrably false statement that she saw Smith gloating at the crime scene. Smith argues that had Sergeant Almada disclosed this information, the jury in Smith's first trial would have acquitted him (or, at the very least, the judge in Smith's first trial would have dismissed the case immediately after the mistrial), and thus Smith would not have remained in jail for five months until his second trial.

Smith makes a novel argument. In most *Brady*-based § 1983 claims, the plaintiff has suffered a criminal conviction,

arguably because the government failed to disclose exculpating evidence. But no jury ever convicted Smith. Instead, Smith says he was injured by the five months he spent in jail after the first trial and until the judge in his second trial dismissed the charges against him.

**[7]** Three of our sister circuits have found that a defendant who is ultimately acquitted cannot maintain a *Brady* claim. *See Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999) ("Regardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial."); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998) ("Plaintiff . . . was never convicted and, therefore, did not suffer the effects of an unfair trial. As such, the facts of this case do not implicate the protections of *Brady*."); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988) (holding that "[b]ecause the underlying criminal proceeding terminated in appellant's favor, he has not been injured by the act of wrongful suppression of exculpatory evidence" and thus cannot maintain *Brady*-based § 1983 claim); *cf. also Taylor v. Waters*, 81 F.3d 429, 435-36 (4th Cir. 1996) (finding that no settled Fourth Amendment authority prohibited officer from withholding exculpatory evidence from § 1983 plaintiff who was never tried on underlying criminal charges).

Moreover, although the Seventh Circuit has not completely foreclosed *Brady*-based § 1983 claims without a conviction, it requires the plaintiff to show that no trial would have occurred if police had disclosed the exculpatory or impeachment evidence. *See Bielanski v. County of Kane*, 550 F.3d 632, 644 (7th Cir. 2008) (expressing doubt that " 'an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation,' " but concluding that plaintiff's claim fails where "the decision to go to trial would not have been affected by the allegedly withheld evidence") (citation omitted); *Mosley v. City of Chicago*, No. 09-3598, ___ F.3d ___, 2010 WL 2943907, at *4 (7th Cir. July 29, 2010) (same).

**[8]** These courts logically find that an acquitted defendant fails to establish a *Brady* violation because he cannot show "that the favorable evidence could reasonably be taken to put the whole case in such a different light *as to undermine confidence in the verdict*." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (emphasis added). *See also Banks v. Drake*, 540 U.S. 668, 699 (2004) ("[Defendant] must show a reasonable probability of a different result."); *Strickler v. Greene*, 527 U.S. 263, 289 (1999) (plaintiff must show "there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense").

These decisions accord with the purpose of *Brady*. At its core, *Brady* seeks to ensure a fair trial, a trial whose verdict is reliable. As the *Brady* Court explained: "The principle . . . is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *Brady*, 373 U.S. at 87-88.

Against this backdrop, Smith says our decision in *Haupt v. Dillard*, 17 F.3d 285 (9th Cir. 1994), allows his *Brady* claim even though he never suffered a conviction. We find *Haupt* distinguishable, find it was based upon a Supreme Court holding that has since been overruled, and find little reason to apply it to this case.

In *Haupt*, during a conference on jury instructions for Haupt's murder trial, the judge indicated to counsel that he intended to give the jury an instruction recommending acquittal. 17 F.3d at 287. The prosecutor objected, and the investigating police officer later telephoned the judge and told the judge that giving an acquittal recommendation would be ridiculous. *Id.* The judge declined to give the recommendation, noting that he felt intimidated by the officer's statement. *Id.* Nevertheless, the jury acquitted the defendant, who then brought a § 1983 claim against the officer for depriving him of the right to a fair trial. *Id.*

We held that the plaintiff stated a claim for violation of his due process right to a fair trial—*i.e.*, the right to "get the unbiased judge to which he was entitled," *id.*—and that his acquittal "sp[o]k[e] only to the amount of damages he suffered" and was "irrelevant to whether he has a cause of action," *id.*[2]

In reaching this conclusion, we relied upon *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) (en banc), a case that allowed a § 1983 action for a *Miranda* violation even though the suspect was never charged and the statement was never used. But in 2003—after *Haupt*—the Supreme Court overruled *Cooper*. *See Chavez v. Martinez*, 538 U.S. 760, 766 (2003) (Thomas, J.) ("We fail to see how, based on the text of the Fifth Amendment, Martinez can allege a violation of this right, since Martinez was never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case."); *id.* at 778-79 (Souter, J., concurring in judgment) ("I do not . . . believe that Martinez can make the 'powerful showing,' subject to a realistic assessment of costs and risks, necessary to expand protection of the privilege against compelled self-incrimination to the point of the civil liability he asks us to recognize here.").

Thus, *Haupt* is distinguishable because it involved a claim for violation of the general due process right to a fair trial—not, as here, a *Brady* claim. Moreover, *Haupt* relied upon authority that has since been overruled. Finally, *Haupt* is inconsistent with *Brady*'s rationale of ensuring a verdict worthy of confidence. We see no reason to extend *Haupt* to Smith's *Brady* claim.

In addition, extending *Brady* to cases without a conviction would render the materiality standard unworkable. In Smith's

---

[2]On its own terms, *Haupt* seems questionable, even when *Cooper* was good law. While *ex parte* contacts from investigating police officer to a judge are completely improper, the judge ultimately had responsibility to properly instruct the jury.

case, to show a reasonable probability that the result of the first trial would have been different, Smith would need to show that *no* reasonable juror would have voted to convict if presented with Nelson's false claim that she saw Smith gloating at the fire scene. Such a calculation (whether there is a reasonable probability that the undisclosed evidence would have caused *all* the jurors to acquit) is significantly different from the calculation in a post-conviction *Brady* claim (whether there is a reasonable probability that the undisclosed evidence would have caused a single juror to vote to acquit).

Allowing *Brady*-based § 1983 claims without a conviction would open the door to a potentially unlimited number of such claims for decisions at every stage of the criminal process. If a police officer failed to disclose victim statements until the start of trial (resulting in a mistrial), and the defendant was jailed for 530 days before retrial but ultimately acquitted, would the defendant have a § 1983 claim? *See Williams v. Krystopa*, No. 98-CV-1119, 1998 WL 961375, at *4 (E.D. Pa. Dec. 16, 1998) ("Plaintiff ultimately did receive a fair trial because [the victim] statement was uncovered in time for its effective use at trial. Moreover, the trial court was able to reach a just conclusion: it declared a mistrial when testimony showed Plaintiff had not received the witness statements, and held a full trial at which Plaintiff, then in possession of the statements, was acquitted. . . . [J]ustice finally did prevail and Plaintiff received a fair trial and a verdict worthy of confidence. . . . [Thus,] no *Brady* violation occurred."), *aff'd* 211 F.3d 1263 (3d Cir. 2000) (unpublished). Would a police officer's failure to provide a defendant with exculpatory evidence support a § 1983 claim where the defendant incurred defense costs but the criminal charges were dismissed before trial? *See Morgan*, 166 F.3d at 1310 (in cases where all criminal charges were dismissed prior to trial, "courts have held universally that the right to a fair trial is not implicated and, therefore, no cause of action exists under § 1983") (citing cases). Our inability to find a principled way

to limit these types of *Brady* claims is therefore a further reason against recognizing the claim Smith makes here.

**[9]** In sum, allowing *Brady*-based § 1983 claims absent a conviction is not compelled by our circuit's case law, conflicts with other circuits' case law and the central purpose of *Brady*, would render *Brady*'s materiality standard unworkable, and lacks a limiting principle. We thus decline to allow § 1983 claims for alleged *Brady* violations by a defendant who is ultimately acquitted.

**2**

Even if an unconvicted defendant could maintain a *Brady*-based § 1983 claim, Smith's claim fails because he has not shown that the withheld evidence was material. First, the evidence of the description of suspects in the previous dumpster fires is not material because it does nothing to undermine the strong physical evidence—*i.e.*, the numerous pieces of mail—linking Smith to the February 2003 fire. Nor does it call into question evidence suggesting Smith's motive: Smith admitted that he had a dispute with Nelson less than three weeks before the fire.

Second, numerous differences between the February 2003 fire and the earlier fires undermine the inference that the dumpster arsonist started the February 2003 fire. Although Sergeant Almada stated that one of the dumpster fires appeared to have been started with an incendiary device in a plastic container, the similarities between the fires end there. The dumpster fires occurred in quick succession over a few weeks; the February 2003 fire occurred three months later. The dumpster fires barely damaged the building's interior; the February 2003 fire ravaged it. Witnesses to the dumpster fires described various suspects with very different appearances, suggesting there was no single repeat offender who might have started the February 2003 fire. And Nelson did not iden-

tify any of the dumpster fire suspects as having a grudge against her—and thus a motive to target Nelson's store itself.

More importantly, Smith does not show that any failure to disclose the earlier fires had any effect. Even without a prosecution disclosure of the earlier fires, Smith's attorney otherwise knew about the October 15, 2002 fire and sought to introduce evidence of that fire. In response to Smith's offer of evidence regarding the October 15, fire, the prosecutor moved the state trial court to exclude evidence of that fire because there was no "direct or circumstantial evidence linking the third person to the actual perpetration of the crime." *See People v. Hall*, 718 P.2d 99, 104 (Cal. 1986). The state trial court agreed and excluded the evidence. Smith's attorney knew of at least one earlier fire, and evidence regarding those earlier fires was likely inadmissible in any case. In sum, we cannot say that had Sergeant Almada disclosed the identification evidence of the earlier dumpster fires, the outcome of Smith's first trial would have been different.

**[10]** We are more troubled by Sergeant Almada's failure to disclose Nelson's demonstrably false account of Smith's gloating at the crime scene. Importantly, Nelson did not testify about the gloating incident at Smith's first trial. Thus, evidence of her false account could have been used only to impeach Nelson's character for truthfulness. *See* Fed. R. Evid. 608(b)(1). But Nelson's testimony was not crucial at Smith's trial. Although Nelson's account of her business dispute with Smith helped establish a motive for Smith to commit the arson—namely, revenge—Smith's own admission of the dispute came in through Sergeant Almada's testimony about his interviews with Smith. More importantly, even if the jury discredited all of Nelson's testimony, it still had the important and unexplained evidence linking Smith to the fire: the numerous pieces of mail addressed over a five-year period to Smith and his wife at their residence.

**[11]** We therefore cannot say that, had Sergeant Almada disclosed Nelson's demonstrably false account of Smith's

gloating at the crime scene before Smith's first trial, no reasonable juror could have voted to convict Smith. Almada's failure to disclose the evidence does not sufficiently undermine our confidence in the outcome of Smith's trial. Hence, because the evidence that Sergeant Almada failed to disclose was not sufficiently material, we hold that the district court correctly granted summary judgment for Sergeant Almada on Smith's *Brady* claim.

## III

For the reasons above, we affirm the district court's grant of summary judgment to Appellee Sergeant Almada.

**AFFIRMED.**

---

D.W. NELSON, Circuit Judge, dissenting:

I respectfully dissent. It is unnecessary for the majority to use this case to define the scope of *Brady*. The majority concludes that the exculpatory evidence withheld from Smith was not material. The *Brady* analysis can and should end there. Until we are faced with a case that would otherwise meet the *Brady* requirements, as construed by the majority, we need not decide whether *Brady* applies when an unfair trial results in anything other than a conviction. Indeed, the majority cites to several cases in which the Seventh Circuit exercised the appropriate level of restraint. *See Mosley v. City of Chicago*, 614 F.3d 391, 397-98 (7th Cir. 2010) (setting aside the question of whether *Brady* applies when a trial results in acquittal); *Bielanski v. County of Kane*, 550 F.3d 632, 643-44 (7th Cir. 2008) (holding that a hypothetical, post-acquittal *Brady* claim would require plaintiff to establish a "reasonable probability" that the decision to go to trial would have been altered by the desired disclosure); *see also Carvajal v. Dominguez*, 542 F.3d 561, 569-70 (7th Cir. 2008) (same). Instead of exer-

cising similar restraint in the tradition of case-by-case adjudi-
cation, however, the majority decides to severely restrict the
scope of *Brady* in the context of a case that it claims could be
clearly decided on the question of materiality alone.

In so doing, the majority is forced to rely upon the sup-
posed internal logic of *Brady* itself and the cursory analysis
offered by a few other circuits. The majority, in effect,
reduces *Brady* to a *post hoc* remedy for criminal defendants
who have been subject to an "unfair trial," *Flores v. Satz*, 137
F.3d 1275, 1278 (11th Cir. 1998), defined narrowly as a trial
resulting in a conviction. *Morgan v. Gertz*, 166 F.3d 1307,
1310 (10th Cir. 1999). This approach excludes acquittals,
hung juries, and even situations in which a judgment of con-
viction was simply never entered, *id*., thereby replacing
*Brady*'s broad due process pronouncements with a results-
oriented test that loses sight of the roles that police and prose-
cutors play in "shap[ing] a trial that bears heavily on the
defendant," whatever the verdict. *Brady v. Maryland*, 373
U.S. 83, 88 (1963).

To further justify its reductive reading of *Brady*, the major-
ity contends that drawing the line at criminal convictions is
the only way to keep the floodgates shut on *Brady*-based Sec-
tion 1983 claims. This argument ignores, of course, the limits
set by the *Brady* requirements themselves: that the plaintiff
allege (1) the withheld evidence was favorable either because
it was exculpatory or impeaching, (2) the evidence was sup-
pressed by the government, and (3) the nondisclosure preju-
diced the plaintiff. *Strickler v. Greene*, 527 U.S. 263, 281-82
(1999). By separating its materiality analysis from its discus-
sion of the meaning of *Brady*, the majority wants to have its
cake and eat it too. While acknowledging the high bar on
materiality set by the Supreme Court in *Kyles v. Whitley*, 514
U.S. 419, 432-38 (1995), the majority simultaneously insists
that further restrictions are necessary to avoid a slippery
slope.

Because I disagree with the majority on both the materiality of the suppressed evidence in this case, *see infra* Section II, and the larger question of *Brady*'s application, *see infra* Section III, I would reverse the district court's grant of summary judgment regarding Smith's *Brady* claim and remand for further proceedings consistent with this dissent.

# I

On October 7, 2002, a small fire was set outside the Simply Sofas building at 2408 Lincoln Boulevard in Santa Monica, California. Three similar incidents soon followed—on October 15, November 21, and November 25. Sergeant Almada of the Santa Monica Police Department created a report to track the string of fires. This report indicated that the fire source in at least one of the incidents was a "possible chemical based incendiary device in a plastic container." None of the descriptions of potential suspects offered by witnesses remotely matched Mr. Smith, and the report described the one suspect as a white male in his 30s. Mr. Smith is African-American.

On February 13, 2003, a fire destroyed Simply Sofas and an adjacent consignment shop called Lona Antiques. Both businesses were operated by Marilyn Nelson and her son-in-law, Matt Schoffman. Fire investigators determined that the fire had been started intentionally with several water bottles stuffed with paper and gasoline. At least one of the water bottles contained mailing materials that had been sent to Mr. Smith or his wife.

On February 17, 2003, Sergeant Almada conducted a detailed interview with Marilyn Nelson. When asked whether anyone would want to burn down her store, Nelson referred to a former employee she had recently terminated and a customer who had made some threatening statements in the past. She did not mention Mr. Smith's name. More than four months later, on June 27, 2003, Almada informed Nelson that Mr. Smith was a suspect in the investigation surrounding the

fire on February 13, and Nelson was able to recount a dispute over a broken consignment item. Several days later, Nelson contacted Almada to report that she had seen Smith on June 28, 2003, "laughing and smiling as he pointed" at the burnt building. In an attempt to corroborate Nelson's story, police reviewed security tapes from Mr. Smith's condominium, which proved that Smith was home with his son on June 28. Nelson could not have seen him that day.

The police arrested Mr. Smith on July 15, 2003. Sergeant Almada never disclosed Marilyn Nelson's false allegation to the prosecutor or the defense. Sergeant Almada also failed to turn over police reports and fliers concerning the incidents of serial arson that had preceded the fire on February 13. Nothing about Marilyn Nelson's disgruntled former employee or her threatening customer were turned over to the prosecutor or the defense before or during two subsequent trials.

The first jury trial took place during the month of June 2004. Afterwards, the jury announced that it was deadlocked 7 to 5 in favor of acquittal. The trial judge denied Mr. Smith's motion to dismiss and granted the prosecution's motion for a new trial. A second jury trial took place during the month of December 2004. Again, the jury reached an impasse, with 11 jurors voting "not guilty" and 1 juror voting "guilty." On December 14, 2004, the trial judge dismissed the case, after Mr. Smith had spent approximately seventeen months in custody.

## II

According to the Supreme Court, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the *proceeding* would have been different.'" *Kyles*, 514 U.S. at 433 (emphasis added) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The touchstone for the Court's analy-

sis of materiality is the "reasonable probability" of a different result, which is shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Id.* (internal quotations omitted). *Bagley* materiality, which is gauged in terms of the "cumulative effect of suppression," leaves the government with a degree of discretion, but it also imposes a "corresponding burden." *Id.* at 437. The police's and the prosecution's "responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."[1] *Id.* at 438.

The majority presents a misleading picture of how this materiality standard would apply in the case at hand. Rather than analyzing the cumulative effect of the suppression, the majority simply dismisses much of the misconduct "item by item" before applying an incorrect materiality standard to just one piece of suppressed evidence—the false account of Smith's alleged gloating at the crime scene. *Kyles*, 514 U.S. at 436. In the majority's view, it therefore "cannot say" that "no reasonable juror could have voted to convict Smith." The Supreme Court has made it clear, however, that the question is "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434. In Smith's case, the relevant question is whether the cumulative effect of the suppressed evidence raises a "reasonable probability" of a different result. In other words, this Court should have considered the prosecutor's decision to go to trial in the first place *and* whether the resulting trials produced outcomes worthy of confidence.[2]

---

[1]According to the majority, the responsibility to disclose exculpatory evidence is entirely escapable, assuming that the trial results in anything other than a conviction.

[2]This materiality standard is just as "workable" in the case of a hung jury as it is in the case of a conviction. It is the majority's misstatement of the standard that leads it to see *Bagley* materiality as somehow untenable in the former case.

Judged by this standard, I believe that the exculpatory evidence withheld from Smith and the prosecutor was clearly material. The police withheld information about the four fires set prior to the arson at issue here. At least one of those fires was started with a device similar to those used on February 13. The descriptions of the suspects in the other fires did not match Smith. The majority believes that this evidence does not undermine Smith's motive. Motive becomes irrelevant, however, if there is a reasonable probability that the jury would have concluded that someone else set the fire. Had the police disclosed this information to the prosecutor, I believe there is also a reasonable probability that the case would not have gone to trial in the first place.

The police also failed to disclose Nelson's false identification of Mr. Smith. Nelson was either mistaken or she lied. Either way, this suppressed information could have served as impeachment evidence of the type that must be disclosed pursuant to the *Brady* requirements, *see Strickler*, 527 U.S. at 280, and I cannot conclude as a matter of law that this information was not of sufficient significance to result in the denial of the defendant's right to a fair trial.

Even without a conviction, it is undeniable that there was prejudice in this case. Smith spent over seventeen months in custody, from the date he was charged in July 2003, through two trials resulting in hung juries, until the trial judge finally dismissed the case on December 14, 2004.[3] The cumulative effect of the evidentiary suppression gives rise to a reasonable probability that its disclosure would have led to a different result. The prosecutor might have decided not to bring the case at all, or the jury might have acquitted Mr. Smith.

---

[3]Compared to cases where a defendant is convicted and subsequently exonerated and those where "all criminal charges were dismissed prior to trial," this case is much more like the former, in which a defendant is normally permitted to "pursue § 1983 claims based on the denial of a fair trial." *Morgan*, 166 F.3d at 1310.

Instead, he had to bear the extraordinary weight of the state's unsuccessful effort to convict him, and then he had to do so all over again.

**III**

The majority also holds that there has been no *Brady* violation when a trial results in a hung jury, even though the government withheld evidence favorable to the accused that undoubtedly undermined confidence in the outcome of his criminal proceedings, and even though the accused was subject to a second trial based on the same evidence.

The question of whether there is a *Brady* violation when a trial does not result in a conviction has not been resolved definitively in the Ninth Circuit. Because the majority has decided to reach this issue, we are forced to grapple with the meaning of *Brady* in its current context. This is a tall order, and we are guided only by inconclusive dicta. *Compare Bagley*, 473 U.S. at 678 (identifying evidence as material under *Brady* when "its suppression undermines confidence in the outcome of the trial"), *with Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006) ("The animating purpose of *Brady* is to preserve the fairness of criminal trials.").

On balance, however, the precedent in the Supreme Court and in our Circuit cuts against the idea that the right to the disclosure of exculpatory evidence is vitiated simply because a conviction does not result. *See Kyles*, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."); *Brady*, 373 U.S. at 87 (stating that purpose of the rule against suppression of evidence is "avoidance of an unfair trial to the accused"); *United States v. Agurs*, 427 U.S. 97, 104 (1976) (part of the concern is preventing "corruption of the truth-seeking function of the trial process"); *Morris*, 447 F.3d at

742 ("The animating purpose of *Brady* is to preserve the fairness of criminal trials.") (citations omitted); *Haupt v. Dillard*, 17 F.3d 285, 287 (9th Cir. 1994) ("The fact that Haupt ultimately was acquitted speaks only to the amount of damages he suffered; it is irrelevant to whether he has a cause of action.").[4]

*Brady* pursues two interdependent goals; it is a judicially enforced mechanism for *both* protecting the right to a fair trial *and* discouraging misconduct on the part of police and prosecutors. It is hard to imagine protecting this right without also discouraging misconduct. The majority would, nevertheless, have us believe that *Brady*'s broad statements about due process can be reduced to a backward-looking check on only the most egregious instances of evidentiary suppression—those that result in conviction. This approach not only distorts *Brady* and its progeny;[5] it also creates perverse incentives for police and prosecutors who believe they will not successfully convict a particular criminal defendant—in which case it would make sense to suppress evidence, knowing that the suppression would probably not be uncovered and the suspect would at least be subject to a lengthy criminal trial.

---

[4]The majority opinion distinguishes *Haupt* in part because it was based on a Supreme Court decision that has been overruled by *Chavez v. Martinez*, 538 U.S. 760 (2003). However, *Martinez* was based on a reading of the Fifth Amendment's requirement that "[n]o person . . . be compelled *in any criminal case* to be a *witness* against himself." *Id.* at 766 (emphasis in original) (internal quotations omitted). The Supreme Court found a criminal case to commence with the initiation of legal proceedings, not with police questioning. The case does not control the question whether a criminal defendant can assert a constitutional violation where the trial results in acquittal.

[5]Since *Brady* was decided in 1963, the Supreme Court has repeatedly expanded upon its initial insight, holding that the Constitution also requires the disclosure of impeachment evidence, *Giglio v. United States*, 405 U.S. 150, 154 (1972), evidence possessed by the government even if not by the prosecutor, *Kyles*, 514 U.S. at 438, and evidence not specifically requested by the defense, *Agurs*, 427 U.S. at 107.

The fact that a defendant is fortunate enough to escape conviction does not absolve the state of responsibility for the breach of its *Brady* obligations. The individual's right to a fair trial, mandated by the due process clause of the Fifth Amendment, does not hinge on the outcome of criminal proceedings.

In the case at hand, the prejudice suffered by the defendant is obvious, and I cannot conclude that Smith's right to a fair trial was not violated, simply because the trial resulted in a hung jury, rather than a conviction. Absent police misconduct, Smith might not have been charged in the first place. As a result of the evidentiary suppression, Smith's right to a fair trial was compromised. The jury knew about Smith's dispute with Nelson, but it did not know about the other suspects in previous fires or Nelson's false identification of Smith. Withholding this evidence is precisely the type of conduct that "undermines confidence in the outcome of [a] trial." *Bagley*, 473 U.S. at 678.

Because I would hold that Smith is entitled to seek recovery on the grounds that the government violated its *Brady* obligations, I dissent.